598 A.2d 543

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Stephen W. MALONEY.**

Superior Court of Pennsylvania.

Argued April 16, 1991.

Filed Sept. 10, 1991.

Reargument Denied Nov. 7, 1991.

Ann A. Aschauer, Asst. Dist. Atty., Media, for Com.

John J. Duffy, West Chester, for appellee.

Before MONTEMURO, BECK and TAMILIA, JJ.

BECK, Judge:

The Commonwealth appeals from the trial court's order granting appellee Stephen Maloney a new trial after a jury convicted him of involuntary deviate sexual intercourse and indecent assault. Since we find that the trial court's grant of a new trial constituted an abuse of discretion, we reverse the order and remand for the imposition of sentence.

The evidence which formed the basis for the convictions of involuntary deviate sexual intercourse and indecent assault was as follows. Both the defendant, Maloney, and the complainant, Katherine Lehmann, were students at Villanova University. At the time the offenses occurred, Maloney was a junior and Lehmann was a freshman. Both were members of the swim team and it was through participation on the team that they were acquainted.

On homecoming weekend, October 28–29, 1989, both Maloney and Lehmann attended a swim team party at a private home in Bryn Mawr. They did not arrive at the party together. Lehmann had been driven to the party by a friend after leaving her own car parked at the Villanova campus. Because Lehmann knew she eventually had to drive herself home from campus to her aunt and uncle's house where she was residing, she did not have anything to drink at the party. At approximately midnight, Lehmann was ready to leave the party and she got a ride back to campus from a young woman, Mary Mayfield. Maloney

was also in the car and during the ride to campus, he displayed a flask to Lehmann and remarked that it was grain alcohol and that he had been drinking it all night. Lehmann remembered seeing Maloney with the flask in his hands at the party.

When they arrived at Villanova, Lehmann and Maloney got out of Mayfield's car and Lehmann headed toward her car to drive herself home. Maloney followed her and persuaded her to drive him to his dormitory, explaining that, even though the building was nearby, he was drunk and tired and needed the ride. Lehmann complied. When they arrived at his dormitory, Lehmann got out of the driver's seat in order to let Maloney out of the car since the passenger's door was broken. Maloney slid into the driver's seat. Alone in the car he then began acting foolishly, at first driving Lehmann's car around the parking lot and then running into the dorm with her car keys. Lehmann followed him, and Maloney convinced her to accompany him to his room on the pretext that she could say hello to other members of the swim team. When she arrived there was nobody else there. Maloney continued to insist that the others had "just run into the bathroom, they will be right back." After Lehmann stepped into the room, Maloney, in order to keep the room dark, pushed the only lamp in the room onto the floor and Lehmann heard him locking the handle of the door.

Thereafter, Maloney began a sexual assault on Lehmann which lasted about two hours. At first, Lehmann was more disgusted and astonished than frightened. She continually attempted to push Maloney away and both physically and verbally refused Maloney's advances. The episode culminated in Maloney forcing Lehmann to perform oral intercourse, during which he caused himself to ejaculate all over Lehmann's hair and face. Then, claiming that he had "a big [swim] meet" the next day, Maloney climbed into his bed and appeared to either fall asleep or pass out. Lehmann left.

As soon as Lehmann left the room she began to search for her friend, Dave Wohlsifer, whom Lehmann described as her best friend on campus. She found him and another student, Mike Lobiondo, in the lounge of the dorm. Her appearance alarmed Wohlsifer who repeatedly asked her what was wrong. Lehmann's eyes were red, her makeup was smeared and she was crying. Wohlsifer gave her tissues to clean the semen from her hair and made her some tea because she complained of a bad taste in her mouth.

Mike Lobiondo also attested that Lehmann was "a wreck" when she entered the lounge. She was crying, fidgeting and upset almost to the point of making no sense. She referred to herself as having been humiliated and victimized. However, since Lehmann did not know Lobiondo nearly as well as she knew Wohlsifer, she hesitated to reveal the details of the assault while Lobiondo was still in the room. She waited instead until she was alone with her friend.

Despite her ordeal in October, Lehmann did not report the assault to police until the following March. She was afraid of the publicity which might surround the disclosure and she feared that confronting a trial could be worse than the episode itself. Further, she felt that publicizing the assault might reflect negatively on the swim team and make her membership on the team difficult. She wanted to avoid further humiliation and pain. However, Lehmann changed her mind in March when she read a newspaper article about another girl on the swim team being sexually assaulted in her dorm room at Villanova. Lehmann felt guilty and reproached herself that her silence had somehow contributed to the assault on the second girl. As a result, she told the police what had happened to her the prior October. It must be noted that, in fact, Stephen Maloney was the accused in the March incident as well, and following his arrest for both assaults, the Commonwealth initially sought to consolidate the two cases for trial. However, the trial court granted the defense motion to sever the trials and further imposed a limitation on the prosecution to prohibit

reference to the other charges against Maloney. Thus, when Lehmann referred to the March incident, she alluded only to the victim of the crime and not at all to the alleged perpetrator.

Maloney's defense was that he was the almost unwitting recipient of sexual favors from a freshman girl who was nearly a stranger to him until the night of the swim team party. Maloney testified that Lehmann offered to accompany him to his room and that she initiated and escalated the sexual advances. In fact, it was Maloney's testimony that he intended to terminate the encounter but that Lehmann unexpectedly unbuckled his pants and "started giving [him] oral sex". The incident ended with Maloney ejaculating in Lehmann's hair which embarrassed him and allegedly angered Lehmann. According to Maloney, he and Lehmann saw each other regularly after that, but only in the capacity of teammates and "friends." He testified that after the initial embarrassment of seeing her again after that night, relations between them were "calm and friendly." Finally, Maloney testified that the following morning he told some friends, most of whom were male members of the swim team, that a freshman girl had accompanied him home after the party and performed oral sex on him. This testimony was the basis of the defense's theory that Lehmann's accusations regarding the sexual assault were occasioned by her resentment of Maloney's "bragging" to his friends of their sexual encounter.

The jury convicted Maloney of indecent assault and involuntary deviate sexual intercourse. Post-verdict motions were filed and, in arguing for a new trial, defense counsel raised the two issues upon which the trial court has granted defendant a new trial. First, he argued that reversible error occurred when Katherine Lehmann testified on direct examination that the reason she came forward in March to report the assault after months of delay was because she had learned of another sexual assault on campus and that she was motivated by guilt. Defendant argued that her testimony tacitly implicated Maloney, thereby offending the

trial court's ruling excluding reference to Maloney's other charges and irreparably prejudicing the jury. Defendant also sought a new trial because, during deliberations, the jury was allegedly exposed to and prejudiced by a newspaper article which disclosed the existence of the other charges against Maloney. The trial court found merit in both arguments and granted defendant a new trial. The Commonwealth appealed. We reverse.

■ As noted above and as stated by the trial court in its opinion, prior to trial the court instructed the prosecutor that "it would not permit any reference to **other charges against the Defendant in this case.**" During direct examination of Katherine Lehmann, the following occurred:

[Prosecutor]. Speaking of the police, did you report this to the police in November or December?

[Witness]. No.

[Prosecutor]. Did you report it to the police in January or February?

[Witness]. No.

[Prosecutor]. How about in March?

[Witness]. Yes.

[Prosecutor]. What happened in March to prompt you to go to the police with this incident?

[Witness]. In late March, I read in the newspaper about another girl on the swim team being assaulted in her bedroom—on her dorm room in her bed.

[Prosecutor]. At Villanova this is?

[Witness]. On the campus. Yes.

[Prosecutor]. All right.

[Witness]. And I started to feel really guilty about not initially coming forward, so being that maybe somehow reporting my incident might have, I mean, somehow, prevented this girl from having to go through something similar to what I had to go through.

[Prosecutor]. And as a result of that, did you, in fact, go to the police?

[Witness]. Yes.

Lehmann then went on to testify about her reasons for failing to report the assault until March. At no point during the above-transcribed testimony did defense counsel object, seek a mistrial or request cautionary instructions. The Commonwealth argues that the trial court erred in granting a new trial on this belated claim of error. The Commonwealth contends that the trial court abused its discretion because Lehmann's testimony made no reference to defendant and therefore did not prejudice him nor breach the trial court's limitations.[1] We agree.

Our reading of the entire record convinces us that the prosecutor's direct examination and the answers given thereto by Lehmann remained within the bounds of the trial court's directive not to refer to the other charges pending against this defendant. In the first instance, the prosecutor foretold precisely this aspect of Lehmann's testimony in his opening statement to the jury. He stated:

She made a decision not to proceed with reporting this to anyone else that night, I specifically mean the police. The months passed and then in March of 1989, she saw an article in the newspaper where another Villanova student was assaulted in her room and she thought this is not right. "I cannot ignore what happened to me. It's time for me to come forward."

And ladies and gentlemen, that's the reason you are here today. Because she made the decision, albeit five months later, through this article in the newspaper she saw, that she cannot remain silent when she saw this other thing happen in her university and she came forward and she is going to tell you the story that I just conveyed to you.

1. The Commonwealth alternatively argues that even if the jury could have inferred that defendant was the accused perpetrator in the second incident, the error was nevertheless harmless because the evidence of defendant's involvement in the second attack was independently admissible. We do not reach this issue because we are convinced that the jury could not have reasonably so inferred based on the testimony and the record in this case.

In his opening remarks the prosecutor thus evinced his understanding of the trial court's admonition to keep evidence of the other charges against the defendant out of the case. Apparently, this understanding was shared by defense counsel and the trial court because at no point thereafter, during opening statements or at any other stage of the proceedings, did defense counsel object to the anticipated and elicited testimony by Lehmann.[2] Furthermore, the trial court did not at any time interrupt or warn the prosecutor that the testimony he planned to bring out would breach the court's earlier ruling. Finally, during direct examination, when the complained-of testimony was introduced, no objection was made by defense counsel. If the testimony was the "flagrant" violation of the prior ruling by the court on "other crimes," surely the prosecutor's augering of the testimony and the testimony itself would have precipitated appropriate objections and motions by defense counsel. However, they did not.[3]

In addition, and more importantly, we do not think that Lehmann's testimony, either expressly or implicitly, gave rise to an inference of prior criminal activity by this defendant. The rule by which such allegations are resolved is as follows: "Purported references to a defendant's prior criminal activity will not be deemed prejudicial unless the remarks convey to the jury, either expressly or by implication, the fact that the defendant committed a prior criminal offense". *Commonwealth v. Hamm*, 325 Pa.Super 401, 412, 473 A.2d 128, 134 (1984). Clearly, Lehmann's testimony did not expressly convey to the jury that Maloney was

**2.** Given the posture of the instant case, i.e., that the Commonwealth is appellant, the issue of whether counsel's failure to object to Lehmann's testimony waived the issue is not technically before us. However, were the case in a different procedural posture and, for instance, post-verdict motions had been denied and defendant was appealing on the ground that he was prejudiced by the admission of Lehmann's now-contested testimony, the failure to object would certainly have constituted waiver and been fatal to his claim.

**3.** In light of the above-quoted remarks by the prosecutor regarding Lehmann's expected testimony, appellee cannot claim that the testimony "could not be anticipated by counsel."

the alleged attacker in the March incident. Nor, in our view, could the jury reasonably infer this from the testimony given. The witness' testimony was singularly vague and sketchy. Lehmann's testimony was designed to and did communicate only the notion that her eventual disclosures to the police were motivated by the dismaying suspicion an earlier report "maybe somehow" "might have" spared the other girl. In fact, the defendant used this testimony to his advantage by intimating that the newspaper article provided Lehmann with an "excuse" to seek revenge on Maloney, under the guise of jumping on the rape "bandwagon." We conclude that the jury could not reasonably have inferred that this defendant was connected to the March incident which precipitated Lehmann's delayed revelations. It was an abuse of discretion to grant a new trial on this basis.

■ Similarly, we find that the trial court erred in granting defendant a new trial on the ground that "a portion of the jury had breached its duty by exposing itself to [prejudicial] information" in a local newspaper. The conclusion that the jurors were "tainted" by media exposure is wholly unsupported by the record.

During the jury's deliberations it came to the attention of the court that the Delaware County Daily Times had, in that morning's edition, published an article concerning the charges facing the defendant. The article appeared on page 28 of the paper and was five columns long. The headline read "Ex–'Nova student denies charges." The article recapitulated defendant's theory of the case which was to paint the victim as a seductress who fabricated the charges when she learned that the exploits she allegedly initiated with Maloney were being publicized about campus by him. The article also summed up closing arguments.

Toward the end of the fourth column of the article, the following sentence occurred: "Maloney is also scheduled to stand trial next week on charges he indecently assaulted a 19–year–old student in her dormitory room on March 20, 1989." If there was any reasonable way to conclude on this record that a juror or jurors had seen the aforementioned

sentence, we would agree with the trial court that defendant is entitled to a new trial. However, the record affirmatively establishes otherwise.

The trial court, having been made aware of the article, took the appropriate, indeed necessary,[4] step of interviewing each juror to determine the extent, if any, of the juror's exposure to the article and its contents. Juror Number One, whose exposure to the article was potentially *the most* troublesome, told the court that he glanced through the paper, saw the headlines and "threw the newspaper down." He unequivocally stated "I didn't read it." When pressed by the court further, the juror reiterated that he didn't read it at all. He noted that no other juror even knew about the article until he mentioned its existence, but that no further discussion about it occurred. Juror Number Two stated that he didn't hear anything about the article but that he knew one juror had a paper which was confiscated. Juror Number Three had the newspaper when she arrived in court that morning but the paper was taken from her. She told the court that she did not even see the article, much less read it. Juror Number Eight stated that he heard that "there was an article" from Juror Number One but that nothing more was said about it. Juror Number Nine similarly heard of the existence of the article and that it contained "[Maloney's] side of the story. That's all."

The foregoing constituted the sum total of the jury's "exposure" to prejudicial information. The rest of the jury had no knowledge about the article or of its existence. Defense counsel moved for a mistrial which the trial court denied. Subsequently, however, following post-verdict motions and argument thereon, the trial court reversed itself and found that "at least a portion of the jury had breached its duty by exposing itself to the information."

4. *See Commonwealth v. Bruno*, 466 Pa. 245, 267, 352 A.2d 40, 52 (1976) ("The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of other jurors.")

We note that the trial court did not find the jurors' representations regarding their familiarity with the contents of the article to be incredible or false. On the contrary, at the conclusion of post-trial argument, the trial court stated that he was "not finding that 12 people lied or that anyone lied." He concluded merely that defendant had not received "a fair trial." This conclusion is without record support and therefore constitutes an abuse of discretion.

Unless the trial court specifically disbelieved the testimony of one or more of the jurors, and had articulable reasons for so concluding, the record is altogether clear that not one of the jurors had any exposure to the prejudicial information in the article at issue. Not only had the jury not read the article but the little it did know was unexceptional. The most that any juror learned from the fleeting realization that an article on the case even existed was that Maloney denied the charges against him. Obviously, this was neither prejudicial nor new to the jury.

Moreover, we reject the conclusion that the members of the jury "breached" their duty to avoid media coverage of the case. Based on this record, we find instead that the jurors scrupulously attempted to avoid undue exposure. The only juror who actually saw the article only glimpsed at the headline which prompted his immediate discarding of the newspaper. Furthermore, the jury was instructed repeatedly to base its decision solely on the evidence it heard at trial and was pointedly cautioned following the news article incident to "completely forget" it and to continue with deliberations based on the evidence alone. Such precautionary instructions should suffice, particularly in a case where no actual prejudicial material was unearthed. *See Commonwealth v. Jermyn*, 516 Pa. 460, 483, 533 A.2d 74, 85 (1987); *see also United States v. Polizzi*, 500 F.2d 856 (9th Cir.1974); *Adjmi v. United States*, 346 F.2d 654 (5th Cir.1965).

We cannot conclude that the grant of a new trial is warranted on grounds as speculative as those found here.

Mr. Justice Holmes long ago noted that: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day." *Holt v. United States*, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910). We agree.

We find nothing in the record to taint the integrity of the jury's verdict. Therefore, we reverse the trial court's grant of a new trial and remand for the imposition of sentencing. Jurisdiction is relinquished.

TAMILIA, J., files a dissenting opinion.

TAMILIA, Judge, dissenting.

I dissent and would affirm the trial court's May 31, 1990 Order granting appellee, Stephen W. Maloney, a new trial after a jury convicted him of involuntary deviate sexual intercourse[1] and indecent assault.[2]

The relevant alleged facts are the victim was a freshman at Villanova University and a member of the women's swim team. On October 28, 1988, appellee, a junior and member of the men's swim team, and the victim arrived separately at a team party at a private home in Bryn Mawr, Pennsylvania. At approximately 12:00 a.m., the victim asked fellow party-goer Mary Mayfield to drive her to the victim's car which was parked on campus. Appellee also rode back to campus with the two. On the drive back, appellee appeared intoxicated and bragged to the women he had been drinking grain alcohol all evening. The victim and appellee got out of Mayfield's car at the Villanova campus. After a series of childish pranks, appellee coaxed the victim to join him in his dorm room, under the auspices she could meet other swim team members who were also in his room. The victim then followed appellee to his room and, to her surprise, no one else was present. Thereafter, appellee proceeded to lock the victim in the room and turn out the lights. An

1. 18 PA.C.S. § 3101.
2. *Id.,* § 3126.

ordeal lasting approximately two hours ensued. During the course of the following two hours, appellee made sexual advances toward the victim, forcibly constrained her from leaving and violently forced her to perform acts of oral copulation. The victim did not come forward and tell her story to police until March 23, 1989, approximately five months after the incident, when appellee was charged with similar crimes allegedly committed against another Villanova University co-ed.

The Commonwealth initially asserts the trial court erred in granting a new trial on the basis the appellee was prejudiced by an alleged violation of the court's directive prohibiting the Commonwealth from making any reference to the appellee's pending charges arising out of the March incident with a different Villanova co-ed. The portion of the direct examination which the trial court found violative of its Order and prejudicial to appellant is as follows:

Q. Speaking of the police, did you report this to the police in November or December?

A. No.

Q. Did you report it to the police in January or February?

A. No.

Q. How about in March?

A. Yes.

Q. What happened in March to prompt you to go to the police with this incident?

A. In late March, I read in the newspaper about another girl on the swim team being sexually assaulted in her bedroom—or her dorm room in her bed.

Q. At Villanova this is?

A. On the campus. Yes.

Q. All right.

A. And I started to feel really guilty about not initially coming forward, so being that maybe somehow reporting my incident might have, I mean, somehow, prevented

this girl from having to go through something similar to what I had to go through.

Q. And as a result of that, did you, in fact, go to the police?

A. Yes.

Q. Did you give them a narrative written statement as to what happened to you?

A. Yes.

Q. It was like seven or eight pages long?

A. It was ten pages long.

Q. Ten pages. Okay.

A. Well, actually eleven.

Q. Katie, why didn't you go to the police after this happened?

A. There were several reasons....

(T.T., 3/20/90, pp. 113–14, emphasis added.)

The restrictions on the testimony presented had been imposed by the trial court pursuant to motions *in limine,* which were granted by the trial court when he instructed the district attorney that he would not permit reference to the other case either by the victim or the district attorney. For the purpose of post-verdict motions, pursuant to Pa. R.Crim.P. 1123, this served to preserve the motion and need not have been raised again prior to the time post-trial motions were filed. *See Commonwealth v. Burchard,* 349 Pa.Super. 456, 503 A.2d 936 (1986). The court, in his Opinion, stated as follows:

Prior to the trial of this matter, the Defense filed a Motion in Limine to exclude any evidence of the existence of the other charges into this case. The Defense antici-pated that the alleged victim in this case might reveal the existence of the other charges against the Defendant when she was questioned by the District Attorney upon direct examination.

. . . .

In an *in camera* proceeding, the Court instructed the District Attorney that the Court would permit no reference to the other charges from Incident Number 2 in the testimony of this case. The District Attorney offered to have the alleged victim to respond only that she has heard of another incident in March of 1989 which compelled her to report what had allegedly happened to her in October of 1988. Again, the Court indicated that it would not permit any reference to other charges against the Defendant in this case.

In her actual direct testimony and in response to the questions from the District Attorney, the alleged victim testified that she reported the Defendant's attack upon her because she had read in the campus newspaper in March of 1989 that another member of the Varsity Swim Team had been attacked in her dormitory room. She further stated that she felt guilty for not having reported the attack upon her by the Defendant for, had she done so, she might have prevented the subsequent attack. This clearly went beyond the ruling in the *in camera* proceedure [sic].

(Slip Op., Labrum, J., 11/16/90, pp. 2–4.)

In light of the above discussion and holding by the trial court, I would find a new trial was properly granted. The testimony presented by the victim upon examination by the district attorney, *in addition to violating the instruction by the court, substantially defeated the purpose for granting the motion of severance of the two cases.* When the informations were prepared, the Commonwealth gave notice it intended to join the two charges. It was following the grant of the motion to sever, in anticipation of the likelihood that the Commonwealth might introduce testimony by the victim revealing the existence of the other charges against the defendant/appellee, that the motion *in limine* was filed. To now hold that a violation of the trial court's rulings is not grounds for a new trial is to totally nullify the court's ability to control the conduct of the trial

and the ability to correct substantial and prejudicial error that occurred thereby.

In addition to the above failure to limit testimony regarding the alleged victim's reasons for coming forward five months after the incident, I believe the trial court did not err in granting a new trial as a result of finding potential prejudice created by jurors discussing the contents of prejudicial newspaper publicity. The two situations, coupled together, served to shift the weight unfavorably for appellee and call into question his ability to receive a fair trial.

At the commencement of proceedings, the trial court instructed the jury against reading or listening to outside sources which could influence or effect their deliberations. In the Thursday, March 22, 1990, edition of the Delaware County *Daily Times*, at page 28, an article appeared entitled *Ex–Nova Student denies charges*. In column four of the five column article, it stated:

Maloney is also scheduled to stand trial next week on charges he indecently assaulted a 19 yr. old student in her dormitory room on March 20, 1989.

Some question arose during the deliberations as to whether jurors read the article. The trial court conducted voir dire examinations wherein:

Juror number one (1) indicated that he has seen the headline of the story but had not read the article. Juror number three (3), who had been in possession of the newspaper, denied reading the article. Juror number two (2) saw juror number three (3) with a newspaper and saw it taken from her when she reached the deliberation room. Juror number eight (8) admitted hearing about the article from juror number one (1). Juror number nine (9) told the Court that he had heard of two newspaper articles. One had apparently appeared on March 21 and the other was the article in question. This juror indicated that he had been told by someone on the jury that the *Times* article reported the Defendant's version on the incident.

The remaining seven jurors indicated no knowledge of the newspaper article.

(Slip Op. at 4–5.) The trial court is in the best position to assess the credibility and demeanor of the jurors during voir dire examination. Thus, it is within the discretionary province of the trial judge to determine whether or not jurors have been influenced. *Commonwealth v. Werts*, 483 Pa. 222, 395 A.2d 1316 (1978); *Commonwealth v. Craig*, 471 Pa. 310, 370 A.2d 317 (1977). Jurors' misconduct by failing to heed the court's ban on reading newspaper accounts of the trial requires a new trial. *Commonwealth v. Williams*, 494 Pa. 496, 431 A.2d 964 (1981).

The trial court made a finding of fact a portion of the jury had breached its duty by exposing itself to the information contained in the article. Based on the jury's exposure to the article as well as conflicting answers given during voir dire examination, the trial court was persuaded the jury had been tainted by the improper information, despite attempted curative instructions. Unlike the majority, I do not believe it is for this Court to substitute its judgment on a factual finding for that of the trial judge. It is hornbook law that the trial judge is in a unique position in determining the credibility of witnesses, including jurors on voir dire, and the weight to be given their testimony and any inferences to be drawn therefrom. Only in the clearest of cases where the judgment of the trial court is totally unsupported by the evidence should we find an abuse of discretion on a fact finding matter.

The Commonwealth responds the error, if any, was harmless because the jury may receive information concerning appellee's alleged involvement in the second incident. The basis for the Commonwealth's argument is the evidence of the second alleged crime is admissible not to show appellee's bad character or propensity for committing criminal acts, but rather, to show intent or motive. The Commonwealth reasons, since appellee asserted the defense of consent, appellee essentially argued he lacked criminal motive or intent. Accordingly, an attack by him on another victim under similar circumstances months later is relevant to

show motive and intent in t: case. I disagree with the Commonwealth's reasoning.

The flaw in the Commonw th's argument begins with its premise the appellee is in: :d guilty of the second act. The second unadjudicated acc is merely an allegation of guilt. Appellee remains cloaked in the presumption of innocence as to the second charge until a jury's final verdict is rendered. To allow the jury to infer guilt in another incident before such an adjudication is made runs counter to the concepts of fairness which the rules of evidence are designed to promote. Here, the Commonwealth attempted to persuade the jury to believe because appellee is charged with another crime, he is indeed guilty of the initial crime. Based on this presumption of guilt, the Commonwealth attempted to suggest to the jury appellee had the motive and intent to commit the instant offense. While bad acts may be admissible in certain limited circumstances,[3] such is clearly not the case here. To allow the jury to make an inference of guilt as to an unadjudicated offense allows for the very tipping of the scales we so ardently strive to balance.

In some cases the evidence is so overwhelming that the error, although prejudicial, still may not require a new trial as we recognize the fact there are few, if any, perfect trials. Despite our increased awareness and sensitivity to campus sexual assaults, we must not be blinded by the publicity and media type to the need for steady and appropriate application of legal principles in deciding these cases, as in any other criminal proceeding. While unquestionably a jury *could* have found appellant guilty on the evidence present-

---

**3.** Evidence of another crime is to be introduced in order to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing the commission of two or more crimes which are so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial under circumstances where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other. *See Commonwealth v. Slyman,* 334 Pa.Super. 415, 483 A.2d 519 (1984).

ed, it is also conceivable, on that same evidence, to have determined a reasonable doubt existed. Evidence favoring the victim included her own testimony and testimony of persons to whom she spoke immediately after the incident to corroborate her story. Evidence favoring defendant included his testimony, the long delay in reporting the incident and possible motive on the part of the victim because of appellee's description of her character in his comments following the incident. In addition, a great number of reputable and important witnesses testified to his good character and reputation for truth. Under these circumstances, even a slight shifting of the weight of the evidence could result in reversible prejudice to appellee.

The most recent and perhaps definitive statement on the issue of abuse of discretion by the trial judge in granting a new trial is *Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240 (1991). There, the Supreme Court was asked to review an Order by this Court, quashing an appeal by the Commonwealth, when the trial court granted a new trial "in the interest of justice" to support his decision. The Supreme Court, in effect, adopted Fed.R.Crim.P. 33, which provides: "[T]he court on motion of a defendant may grant a new trial to him if required in the interest of justice." The application of this discretionary provision has been held to apply broadly and its use may only be reviewed if there is evidence of manifest abuse. A trial court has an "immemorial right to grant a new trial, whenever, in its opinion, the justice of the particular case so requires." (Slip Op., Nix, C.J., 5/1/91, p. 6.) Where it will result in the attainment of justice, a trial court may grant a new trial without the initiation of the defendant.

In *Commonwealth v. Myma*, 278 Pa. 505, 123 A. 486 (1924), we [the Pennsylvania Supreme Court] stated:

> [T]he judge occupies an exalted and dignified position; he is the one person ... from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at counsel table. To depart from the clear line of

duty through questions, expressions or conduct, contravenes, the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence.

*Id.*, 278 Pa. at 508, 123 A. 486.

It is the trial judge's review of the conditions and activity surrounding the trial which leaves him or her in the best position to make determinations regarding the fairness of the process and its outcome. It is apparent, therefore, if a trial court determines that the process has been unfair or prejudicial, even where the prejudice arises from actions of the court, it may, in the exercise of its discretionary powers, grant a new trial "in the interest of justice."

(Slip Op. at 7–8.)

Accordingly, I would find there was no abuse of discretion and would affirm the trial court's decision granting appellee a new trial.