**Commonwealth v. Lungin**

268

*Christopher D. Mannix,* for appellant Lungin.
*Sara Webster,* trial counsel for appellant Lungin.

*Diane E. Gibbons, district attorney* and *Jennifer A. Buck, chief deputy district attorney,* for Commonwealth.

GOLDBERG, *J.,* September 15, 2005—In the morning hours of September 27, 2002, appellant, Roman Lungin, brutally sexually assaulted an unconscious 17-year-old girl. As a result of this assault, on October 28, 2003, a jury convicted appellant of rape,[1] involuntary deviate sexual intercourse,[2] sexual assault,[3] corruption of minors,[4] two charges of indecent assault,[5] and obscene and other sexual materials.[6] On April 6, 2004, after finding that appellant is a sexually violent predator under 42 Pa.C.S. §9795.1 (commonly referred to as Megan's Law), appellant was sentenced to nine and one-half to 22 years incarceration.

On April 16, 2004, appellant filed post sentence motions raising 53 claims of error, many of which alleged ineffective assistance of counsel. On August 16, 2004, we held a hearing on appellant's post verdict claims. At the conclusion of this hearing and after a detailed review of all 53 claims, we denied appellant's post sentence motions.

After appellant filed a timely appeal, we ordered that he file a concise statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b). On October 5,

---

1. 18 Pa.C.S. §3121(a)(3).
2. 18 Pa.C.S. §3123(a)(3).
3. 18 Pa.C.S. §3124.1.
4. 18 Pa.C.S. §6301(a)(1).
5. 18 Pa.C.S. §3126(a)(1) and 18 Pa.C.S. §3126(a)(4).
6. 18 Pa.C.S. §5903(c)(1).

2004, appellant filed a 36-page document containing in excess of *150 matters complained of on appeal.*[7]

The judicial resources expended in addressing these 150 claims has been enormous and has required this court to focus an inordinate amount of time on this matter at the expense of many other cases on our docket. Given the complete disregard for the purpose behind Rule 1925, and recent and established precedent interpreting this rule, we feel obligated to take additional time to address appellant's counsel's flagrant circumvention of the meaning and purpose of Rule 1925(b).

The Pennsylvania Superior Court recently reiterated the rationale of Rule 1925 in the civil case of *Kanter v. Epstein,* 866 A.2d 394 (Pa. Super. 2004). There, two defendants filed Rule 1925(b) statements that included a combined total of 104 alleged issues of error. In concluding that such tactics were "outrageous" and amounted to "misconduct," the Superior Court refused to consider any of the issues raised and found that they were not preserved. *Kanter,* 866 A.2d at 401. The court stated:

"By raising an outrageous number of issues, the defendants have deliberately circumvented the meaning and purpose of Rule 1925(b) and have thereby effectively precluded appellate review of the issues they now seek to raise. . . . We agree with the trial court that the defendants' conduct breached their duty of good faith and fair dealing with the court. The defendants have pursued a course of conduct designed to undermine the Rules of Appellate Procedure." *Id.* at 401-402.

---

7. Several of the claims raised by appellant have sub-sections raising the total number of claims raised on appeal to well over 150 in number.

In *Jones v. Jones,* 878 A.2d 86 (Pa. Super. 2005), appellant submitted a seven-page concise statement, containing approximately 29 issues, and was sanctioned pursuant to Pa.R.A.P. 2744. The Superior Court found that appellant's filing of a lengthy and unmanageable Rule 1925(b) statement placed an undue burden on the trial court and demonstrated a complete disregard for the Rules of Appellate Procedure. Such advocacy was deemed to be frivolous, and the case was remanded to the trial court to determine the amount of the sanctions. *Id.* at 89-91.

Here, appellant's filing of a 36-page, 150-issue Rule 1925(b) statement is a far more egregious breach of the Rules of Appellate Procedure than the conduct in *Kanter* (two appellants—104 issues) and *Jones* (29 issues). Moreover, a general overview of appellant's Rule 1925 statement indicates that his counsel has apparently claimed error on nearly every evidentiary ruling not in his client's favor.[8] Indeed, an overwhelming number of appellant's claims are frivolous and directly refuted by the record. The observation that "the number of claims raised in an appeal is usually in inverse proportion to their merit and that a large number of claims raises the presumption that all are invalid" seems to apply to the instant appeal. *Commonwealth v. Baney,* 860 A.2d 127, 129-30 (Pa. Super. 2004) (citing *Commonwealth v. Ellis,* 534 Pa. 176, 626 A.2d 1137 (1993)).

In retrospect, upon receipt of appellant's submission, we should have ordered that he re-submit a compliant Rule 1925 statement. As that opportunity has passed, we have attempted to address the claims raised. However,

---

8. See *e.g.,* concise statement, ¶¶47-53, 58-83.

pursuant to Pa.R.A.P 2744, we strongly urge that appellant and/or appellant's counsel be sanctioned for their blatant violation of the Pennsylvania Rules of Appellate Procedure.[9]

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented by the Commonwealth overwhelmingly proved that appellant savagely assaulted and then raped an unconscious 17-year-old during a party at his home in the early morning of September 29, 2002.

### I. *Eyewitness Accounts*

The Commonwealth presented numerous witnesses who observed appellant insert various objects into the victim's vagina in front of a room full of people while she lay unconscious on a futon in the basement of his home. The events leading up to these crimes began on the night of September 28, 2002, when the victim attended a birthday party at a Philadelphia restaurant. There, she encountered appellant, who invited her to a party at his house. The victim had four or five vodka shots at the restaurant, and sometime between 1 a.m. and 2 a.m., a friend of appellant, Loren Gershtein, drove ap-

---

9. We recognize that this is an unusual recommendation, especially in a criminal case. However, there is precedent for the imposition of sanctions in criminal matters. See *e.g., Commonwealth v. Reichle,* 404 Pa. Super. 1, 5, 589 A.2d 1140, 1142-43 (1991) and the notes after Rule 2744 which indicate that criminal matters are not excluded from this rule. We also note that Pa.R.A.P. 2116(a)—*Statement of questions involved* requires an appellant litigant to set forth issues in the case "in the briefest and most general terms" and that such statement should not exceed 15 lines and must never exceed one page. Given the number of issues raised by appellant, he undoubtedly will not be able to comply with this Rule of Appellate Procedure.

pellant and the victim to appellant's house. Gershtein testified that at that time the victim was "really drunk." (N.T. 10/22/03, pp. 21, 22, 52-53, 128, 168-69, 170-71.)

Upon arriving at his home, appellant, the victim, and Gershtein went into the basement where people were socializing, watching television, and drinking vodka. Julie Krinsky, who attended the party, testified that around the time the victim arrived at the party, appellant inserted a video of himself having sex with a woman. Gershtein and Krinsky testified that the victim sat on the couch with appellant and within 5-10 minutes, drank one shot of vodka. (N.T. 10/22/03, pp. 22-23, 172; N.T. 10/24/03, p. 108.) Krinsky testified that the victim was drinking vodka and "was a little buzzed . . . she didn't look too sober." Krinsky testified that she also observed the victim drinking orange juice after taking her first shot, and remembered people laughing as the victim drank the juice. (N.T. 10/24/03, pp. 109, 114.) Gershtein noticed that, at this point, the victim was staggering and appeared "woozy" before she eventually laid down on a futon in the corner of the basement. (N.T. 10/22/03, pp. 26-27, 176.)

Krinsky and Marianna Visnadul, who was also at the party, then took the victim to the bathroom and talked to her. According to one version of events, when the victim came out of the bathroom she went into a back office with appellant. Krinsky testified that appellant and the victim were in the office for about 20 minutes and when the victim returned she looked like she was "a little more buzzed . . . [and] was tripping . . . she couldn't walk . . . her legs were crisscrossing back and forth." Krinsky and Visnadul again went into the bathroom with the victim where they asked what had happened. The victim re-

sponded that appellant had performed oral sex on her.[10] After exiting the bathroom, the victim went back to the futon for a second time and lay down. (N.T. 10/24/03, pp. 109-11; N.T. 10/27/03, pp. 11-12.)

Before leaving the party, Krinsky and Visnadul spoke with the victim while she laid on the futon. Appellant came over to the futon and when Krinsky asked the victim if she was okay and if she needed a ride home, appellant said he would drive her home. Krinsky testified that when she left the party, the victim "wasn't fully awake . . . her eyes were half closed and half open . . . she was mumbling . . . she wasn't talking clearly." (N.T. 10/22/03, p. 180; N.T. 10/24/03, pp. 111-12, 123, 129.)

Sometime after Krinsky and Visnadul left, Shirley Maranc and Karina Danilchenko arrived at appellant's home and sat down on the couch in front of the television where the video of appellant having sex continued to play. At the same time, appellant was sitting on the floor next to the futon. Vladimir Pevzner, Boris Shapershteyn and Dmitry Yukhananov stood around appellant. Maranc heard giggling and turned around to ask who was on the futon and learned it was the victim. (N.T. 10/21/03, p. 75; N.T. 10/22/03, pp. 27-29, 32, 92-93.)

Several eyewitnesses testified about what occurred next on the futon. These witnesses stated that while the victim was unconscious and lying on her back on the futon, appellant inserted a shot glass, vodka bottle, candle, light bulb and hanger inside of her vagina. Appellant accomplished these grotesque acts by moving her un-

---

10. As set forth *infra,* this particular sequence of events was contradicted by portions of the victim's testimony and statements she provided to law enforcement after she was assaulted.

derwear to the side in order to insert the objects. (N.T. 10/21/03, pp. 181-83; N.T. 10/22/03, pp. 29-31, 94-96; N.T. 10/23/03, pp. 202, 206; N.T. 10/27/03, p. 77.)

While appellant inserted the shot glass into the victim's vagina, Gershtein heard someone yell "oh shit!" and Danilchenko began to scream because she was afraid it would get stuck. (N.T. 10/21/03, pp. 182, 203; N.T. 10/22/03, p. 30.) Danilchenko and Gershtein testified that they believed appellant then retrieved the shot glass with his fingers. (N.T. 10/21/03, p. 203; N.T. 10/22/03, pp. 30-31.) Gershtein recalled that appellant said he would stop with the shot glass because he was afraid that it would get stuck. (N.T. 10/22/03, p. 71.)

Regarding the victim's state of consciousness at the time, Pevzner testified that she was unconscious while the objects were being inserted because "she wasn't moving . . . she wasn't responding to anything. Her eyes were shut. She wasn't responding to anything that he was doing." (N.T. 10/27/03, pp. 77-78.)

Gershtein testified that while appellant inserted the above objects he observed that the victim was motionless in the beginning, and then within a minute or minute and a half "she was moving around . . . she picked up her head and she put it back down and then she was shaking a little bit as if she was dreaming or something." Gershtein stated that the victim was unconscious when the incident first started to take place. At the time the victim was shaking, Gershtein was unable to say if she was unconscious or not but testified that "she had her eyes closed and kind of blinking." (N.T. 10/22/03, pp. 38-39, 48.)

Maranc testified that while appellant was inserting objects into the victim's vagina, the victim "wasn't do-

ing anything . . . she was just lying there. Except at one part I remember [appellant] did ask her something and she made some type of gesture. She sat up slightly and I don't know what exactly she said, but then she laid back down and that's it from what I remember." Aside from the victim sitting up that one time, the victim made no other movements and was not talking. Maranc did not know whether she was sleeping or whether she was unconscious. (N.T. 10/22/03, pp. 98, 139.)

While Shapershteyn equivocated on direct examination as to the victim's condition, he did acknowledge that he testified at the Grand Jury and during a preliminary hearing that, when the victim laid down on the futon and when he left the house shortly after appellant inserted the objects, she was either sleeping or passed out. (N.T. 10/23/03, pp. 227-33.)

## II. *Videotape Evidence*

Several witnesses explained that at appellant's suggestion, this incident was taped by Pevzner with a video camera. Specifically, Pevzner testified that shortly after he arrived at the party, appellant approached the victim, who was lying on the futon, with a video camera. Appellant videotaped the victim as he picked up an object and began to insert it into her vagina. Appellant then passed the video camera to Pevzner, who testified that the victim was unconscious while he videotaped appellant insert a vodka bottle, shot glass, light bulb, and a hanger into her vagina. (N.T. 10/27/03, pp. 75-77.)

Gershtein corroborated this testimony and stated that Pevzner, who was standing about two to three feet away from the victim, taped the incident with a camcorder.

(N.T. 10/22/03, pp. 40-41.) Maranc also testified that appellant went upstairs and returned with a video camera and gave it to Pevzner, who videotaped the incident. (N.T. 10/22/03, pp. 93, 99.)

After the assault, appellant proceeded to play the videotape in the television. The video lasted about five minutes and depicted the insertion of objects into the victim's vagina. (N.T. 10/27/03, p. 79.)

Because appellant's defense was that the events described above were consensual, if the victim was conscious, as appellant claimed, this video would have been devastating to the Commonwealth's case. However, the Commonwealth established that the video was destroyed at appellant's direction soon after appellant learned that the police were involved.

Specifically, the Commonwealth proved that a few weeks after the incident, Pevzner met with appellant, at appellant's request, to discuss what had happened and what Pevzner should do if approached by the police. Appellant told Pevzner to tell the police that he didn't know anything or see anything happen to the victim on the night in question. Appellant also told Pevzner that he "got rid" of the videotape just before authorities arrived at his house with a search warrant. Approximately two weeks before testifying in front of the Grand Jury, Pevzner was approached by a friend of appellant who instructed Pevzner not to mention the videotape and told him "you don't know anything about it." (N.T. 10/27/ 03, pp. 80-84, 88.) Gershtein testified that approximately 7-10 days after the incident, he saw appellant who told him that the videotape of the victim was destroyed. (N.T. 10/22/03, pp. 46-47.)

The uncontradicted evidence that appellant obstructed justice and had a videotape of the event in question destroyed was compelling evidence of his guilt.

### III. *Expert Testimony*

The Commonwealth called Dr. Richard D. Cohn, a pharmacologist and forensic toxicologist, who specializes in the detection of foreign substances in the human body. Cohn opined that the drugs GHB and Ketamine were ingested by the victim prior to the assault. (N.T. 10/27/03, pp. 25, 32-33, 52.)

Cohn explained that GHB is a chemical substance that depresses the central nervous system and is commonly used as a date rape drug because its detectability in body fluids such as blood and urine does not last very long. Therefore, the likelihood of detecting GHB is remote because by the time the depressant effects have worn off (including hypnotic effects and sleepiness), several hours have passed since ingestion, which is sufficient time for the material to have been excreted, metabolized and degraded. Cohn explained that GHB, while generally odorless and tasteless, may have a salty or sour taste. Cohn further explained that Ketamine is a substance that can be used as a general anesthetic, but is also used as a club drug for its hallucinatory and euphoric effects. (N.T. 10/27/03, pp. 37-40.)

Cohn testified that GHB takes approximately 15-20 minutes to have an effect on an individual. He opined that, based upon the time line of events as set forth in the investigative reports he reviewed, the victim's ingestion of the orange juice and her subsequent passing out were consistent with her having ingested GHB. (N.T. 10/27/03, pp. 43, 49, 51.)

Cohn also opined that the signs and symptoms the victim displayed after waking up on September 29, 2002, were also consistent with her having ingested GHB. Specifically, the victim's feeling dehydrated, her rapid heart rate, absence of nausea or vomiting from alcohol, and minor shaking, coupled with the ingestion of orange juice[11] and subsequent passing out, corroborated his opinion that the victim had ingested GHB. (N.T. 10/27/03, pp. 46-48.)

## IV. *Sequence of Events*

At trial, defense counsel engaged in a line of questioning pertaining to the time line relied upon by Dr. Cohn, which, if believed by the jury, could have impacted the weight they chose to place on Dr. Cohn's opinion. Specifically, Cohn relied on a time line in which the victim consumed the orange juice and then 10 to 20 minutes later went to lay down on the futon. As set forth below, there is support in the record for this sequence of events. Defense counsel referenced a different time line in which the victim drank the juice, went into the office with appellant for 20 to 30 minutes, and then went into the bathroom to talk with her friends before laying down on the futon. Cohn acknowledged that if this time line in fact occurred, he could not be reasonably certain that GHB or Ketamine were causally related to the event. (N.T. 10/27/03, pp. 63-64.)

As many of the issues raised by appellant pertain to the time line of events, we take the time here to review

---

11. Dr. Cohn testified that orange juice is a common vehicle for GHB administration because the citrus masks GHB's salty taste. (N.T. 10/27/03, p. 43.)

the record on this issue. This review should be viewed in light of the fact that the sequence of events was relayed by young adults, all of whom had been drinking at a party at 3 a.m.

Krinsky testified that, after observing the victim drink the orange juice, she and Visnadul brought the victim into the bathroom for three to four minutes and then, 10 minutes later, the victim proceeded into the office with appellant, where she remained for 20 minutes. After leaving the office, the victim went back into the bathroom with Krinsky and Visnadul for two to three minutes and then lay down on the futon. Thus, according to Krinsky, approximately 37 minutes had passed from the time the victim drank the orange juice to when she lay down on the futon. (N.T. 10/24/03, pp. 109-11, 114, 121-22.)

Gershtein testified that after the victim drank the orange juice, she continued to sit on the couch for five to 10 minutes, and then went to lay down on the futon for the first time where she talked to some of the girls and appellant. Although Gershtein did not see the victim and appellant enter the office, he did see them come out of the office. Gershtein estimated that they were in the office for 30 to 40 minutes. Gershtein did not testify as to when the victim lay down on the futon after coming out of the office, or when the office incident occurred in relation to the other events. (N.T. 10/22/03, pp. 23-25, 59-60, 63.)

The victim's trial testimony was inconsistent on the sequence of events. She initially testified that after drinking a shot, she went to lay down on the futon where she briefly conversed with Krinsky and Visnadul. She then went into the office with appellant for 20 to 30 minutes. The victim testified that after going into the bathroom

with Krinsky, she proceeded again to the futon where the events in question occurred. (N.T. 10/22/03, pp. 174-76, 178.)

In telling a different version of events, the victim also testified that, after taking the shot, she drank the orange juice and lay down on the futon after five to 15 minutes and then dozed off. (N.T. 10/22/03, pp. 180-82.) Importantly, this version is consistent with the statement that she gave to police the day after the incident, presumably when her memory was freshest. (See exhibit C-2.) In this statement, the victim indicated that *10 to 15 minutes after she drank the orange juice,* she laid down on the futon and "passed out completely" five minutes later. Thus, under this scenario, 20 minutes passed from the time the victim drank the orange juice to the time she became unconscious. This time line was entirely consistent with Dr. Cohn's opinion.

## V. *Victim's Statements*

The statements provided by the victim immediately after the assault, to her friends, police officers, and hospital personnel, all established that she had no recollection of the incidents that occurred at appellant's party and that, due to her unconsciousness, she did not consent to appellant's insertion of various objects into her vagina.

The day after the assault, Sunday, September 29, the victim awoke at noon and found herself lying naked next to appellant. According to Officer Wojnar, the victim asked appellant what had happened and inquired whether they had engaged in sex and appellant replied that they had. Appellant then drove the victim to her friend, Jackie

Scanzello's house. (N.T. 10/22/03, pp. 189-90; N.T. 10/24/03, p. 141.) The victim testified that she felt "tired, dehydrated and dizzy" that day. She further stated that while at Scanzello's house, she and Krinsky spoke on the phone. (N.T. 10/22/03, pp. 190, 200.) According to Krinsky's trial testimony, the victim told her that she woke up naked in appellant's bed and didn't know what happened. The victim asked Krinsky if she had heard anything and Krinsky told her that people saw objects being inserted into her vagina the night before. (N.T. 10/24/03, pp. 112-13, 125.)

Scanzello testified that she told her mother, Carol Scanzello, about the phone calls and what had happened. After talking to the victim, Mrs. Scanzello called the Lower Southampton Township Police Department and reported the assault to Corporal Michael Pennington, who then spoke to the victim on the telephone. (N.T. 10/21/03, pp. 156, 229-30.) At trial, Corporal Pennington testified to his phone conversation with the victim. She told him that she arrived at appellant's party and one of the males gave her a glass of orange juice, and that after she drank the orange juice people started laughing. The victim explained that after about 15 minutes she didn't feel right and sat on the futon. She explained to Pennington that she had gotten up and then laid back down and "passed out." She told Corporal Pennington that that was the last thing she remembered when she woke up later that morning, naked, lying in bed next to appellant. Corporal Pennington instructed the victim to contact her parents and go to the hospital. (N.T. 10/21/03, p. 156; N.T. 10/24/03, pp. 132-33, 141.)

Mrs. Scanzello then drove the victim to the Frankford Torredsale Hospital where she met her mother and Of-

ficer Michael Wojnar. (N.T. 10/21/03, p. 157; N.T. 10/22/03, pp. 284, 287; N.T. 10/24/03, pp. 139-40, 142-43.) Officer Wojnar testified that, at his request, the victim wrote out a statement. (N.T. 10/21/03, p. 171.) This statement was identified as Commonwealth exhibit C-2 and admitted into evidence during the victim's testimony. (N.T. 10/21/03, p. 171; N.T. 10/22/03, p. 244.) In this statement, the victim reiterated she had "passed out completely" and further explained that "I was dizzy, rapid heartbeat, very dehydrated, I had the chills and shaking a little bit. As far as knowing myself what happened, I have no clue, not the slightest idea. If I was not told I would of never found out." (Exhibit C-2.) (The symptoms described by the victim in this statement the day after the incident are also consistent with the symptoms described by Dr. Cohn, which indicate a date rape drug had been ingested.) In this statement, the victim reiterated to Officer Wojnar that she had asked appellant what had happened and if they had sex, and appellant replied that they did have sex. (N.T. 10/24/03, p. 141.)[12] Officer Wojnar testified that, based on the victim's description of how she felt and his limited knowledge of date rape drugs, he believed it was a possibility that the victim had been drugged. (N.T. 10/21/03, p. 140; N.T. 10/24/03, pp. 140-42, 144.)

While at the hospital, the victim also met with Elizabeth Beasley, an emergency department and sexual assault nurse. Nurse Beasley testified that the victim explained that she had a couple of shots and then went to appellant's house. The victim told Beasley she was scared and didn't know if she had sex or not. She stated that she

12. This evidence supports appellant's rape conviction.

received a phone call the next day from friends describing the events that happened throughout the night. (N.T. 10/24/03, pp. 9, 13, 15-16.)

Nurse Beasley testified that she reviewed the victim's handwritten statement given to Officer Wojnar and then asked the victim additional questions about it. According to Beasley's trial testimony, the victim relayed that, upon arriving at appellant's house, someone had given her a glass of orange juice. When she consumed several sips of the orange juice, she heard people laughing around her and "she felt very, very tired." The victim told Beasley that after drinking the orange juice, she felt very dizzy and went to lie on the futon where she passed out completely. The victim explained to Beasley that she had consumed the same amount of alcohol on other occasions and it had not affected her that way. According to Beasley, the victim was not able to answer questions about what exactly occurred because she did not know what had happened and didn't remember anything. The victim told Beasley, "the last thing I remember was laying down on the bed in the corner of the room and then waking up in the morning." (N.T. 10/24/03, pp. 16-21, 64-66.)

Beasley conducted an examination of the victim, during which photographs were taken of the victim's vagina with a colposcope.[13] Beasley testified that she observed a laceration of .25 centimeters in diameter and a millimeter deep. Beasley also observed that the victim's vaginal wall had collapsed. Beasley explained that a collapse of the vaginal wall is a condition that generally

---

13. This particular colposcope used a lens that magnified the vaginal pictures by 200 times. (N.T. 10/24/03, p. 34.)

occurs in older women who have had multiple children. In her 14 years as an E.R. nurse, Beasley stated that she had never seen such a condition in someone so young. (N.T. 10/24/03, pp. 26-36.)

Corporal Pennington spoke to the victim again on Monday, September 30, at her home. The victim wrote out an additional statement, which was admitted into evidence as Commonwealth's exhibit C-1. (N.T. 10/21/03, p. 158.) The statement reiterated that the victim had no memory of the assault. In this statement, the victim also indicated that appellant told her the day after the incident that "he was the only one who had sex with [her] and only after everyone left."

## VI. *Steven Carnivale Testimony*

Appellant was incarcerated prior to trial, and his cellmate, Steven Carnivale, also testified. According to Carnivale, appellant told him that "a girl was saying she was raped." Appellant advised Carnivale that they were all partying that night, getting high and drunk, specifically on "GHB" and "K." He told Carnivale that, while at his house, they were drinking vodka and watching videotapes of appellant having sex with women. Appellant said that he and the victim were hooking up in front of people and somebody was videotaping it and he was shoving things in her vagina. Appellant claimed that the victim told on him afterwards because rumors were floating around. Importantly, appellant told Carnivale that if it wasn't for her friends making such a big deal about the things shoved inside of her and the people watching, she never would have known about it. Appellant also told Carnivale that his friend burned the videotape made of

the victim that night, along with eight other tapes. Carnivale testified that appellant said he and the victim "were out of it." (N.T. 10/23/03, pp. 113-15, 117, 123-24.)

## VII. *Victim's Recantation*

At trial, the victim recanted from her original statements and claimed that she lied when she told the police and Nurse Beasley that she had been unconscious.[14] Although the victim claimed she was conscious when items were inserted into her vagina, a version completely at odds with her numerous statements after the event, portions of her testimony were consistent with her previous statements. For instance, at trial, the victim recalled having a glass of orange juice when she first arrived at the party. When she drank the orange juice she heard laughing and thought that someone may have tampered with the drink. (N.T. 10/22/03, pp. 180-81, 200.)

At trial, the victim testified that, after drinking the vodka, she laid down on the futon and "dozed off for a little bit." When she woke up, she remembered seeing Maranc and Danilchenko, who she described as new people at the party. She testified that shortly thereafter, appellant came up to her and said something along the lines of trying something "different, kinky." The victim

---

14. The circumstances surrounding the victim's recantation involve frequent interactions with appellant's family in the weeks leading up to trial. According to the victim, she went to appellant's home and told his father and brother that she had lied and wanted to meet with appellant's counsel. The following day, the victim met with appellant's trial counsel and subsequently prepared a handwritten statement that stated all of the sexual activity with appellant was consensual. (N.T. 10/22/03, pp. 202-206, 208-11, 220-23.)

testified that she said okay, even though she didn't really know what he was talking about. Appellant then inserted a candle, vodka bottle, shot glass and light bulb into her vagina. The victim further testified that while appellant was inserting these objects into her vagina, she did not remember anyone around nor did she see anyone with a video camera. The victim also denied that appellant inserted a hanger into her vagina, despite eyewitness testimony to the contrary. (N.T. 10/22/03, pp. 182-86, 242, 256.)

The victim testified that after everyone left the party, she and appellant had sex again. She woke up at noon the following day, completely naked and next to appellant. Later that day, the victim testified that she called appellant and told him that everyone was talking about what had happened the night before and telling her things that she did not remember. The victim stated that she went to the hospital for a check-up because appellant had not used a condom. The victim also testified that the next day she felt "tired, dehydrated, dizzy," which felt different than a hangover and that she was worried that someone had put something in her drink. The victim further testified that appellant went to her house the following day, after learning that she went to the hospital, to apologize to her mother for not using a condom when he had sex with her daughter. (N.T. 10/22/03, pp. 180-90, 192, 197-98, 200-201, 245, 285.)

Prior to trial, the victim testified at the preliminary hearing held on May 5, 2003. The victim's testimony at the preliminary hearing unequivocally established that she did not consent to appellant's insertion of various objects in her vagina and that she was unconscious when

this occurred. These facts were also established before the jury. (N.T. 10/22/03, pp. 201, 251; exhibit C-5.)

## VIII. *Background Relating to Allegations of Juror Taint*

On the second day of trial, a Bucks County assistant public defender, who was not involved in this case, advised the court that her stepson had been selected as juror number 7 and that she had overheard a conversation between him and her husband about the trial. According to the public defender, after the first day of trial, juror number 7 told her husband that "the people surrounding the defendant looked like the Russian mafia." The public defender questioned juror number 7 about his comment and he said that the person in the jury seated next to him allegedly had told him that he lived in the area where appellant lived and that "these people were Russian mafia." (N.T. 10/23/03, pp. 3-7, 12-13.)

Given the receipt of this information, the court extensively questioned juror number 7 outside the presence of the other jurors. Juror number 7 stated to the court that the previous night his father had mentioned that he read an article in the paper about the Russian mafia. Juror number 7 also said that another juror had mentioned reading something in the paper, 13-14 months ago, when the incident first occurred, and that the mafia had some sort of minor involvement. Juror number 7 could not recall which juror had made this comment, but did recall that the juror had *not* made this statement in the presence of any other jurors. (N.T. 10/23/03, pp. 16-17, 19-20, 25.) Juror number 7 indicated that there had not been any open discussion regarding media accounts amongst the jurors, and, although there had been some "mob"

jokes and wisecracks, there were no serious discussions about this topic. The court instructed juror number 7 that he should not speak with any of the other jurors regarding the above described colloquy. (N.T. 10/23/03, pp. 4, 20.)

Thereafter, based on our interview of the public defender and juror 7, we engaged in an extensive in camera colloquy of each juror. Specifically we asked each juror:

• Whether they had read or heard any media accounts about the case before they were selected. (N.T. 10/23/03, pp. 36, 40, 44, 48, 51, 54, 57, 61, 64, 68, 70);

• If anyone had told them about any media accounts regarding the case. (N.T. 10/23/03, pp. 36, 40, 44-45, 48, 51, 54, 57-58, 61-62, 64-65, 68, 70);

• If they had been exposed to any media accounts of the trial since they were selected as a juror. (N.T. 10/23/03, pp. 36, 40, 44-45, 48, 51, 54, 57-58, 61-62, 64-65, 68, 70);

• Whether they had heard any jokes or any disparaging comments from fellow jurors relating to the defendant or his family. (N.T. 10/23/03, pp. 32, 38, 41, 45, 49, 52, 55, 58-59, 62, 68-69, 71); and

• Whether they had heard any fellow jurors talking about any media accounts of the case. (N.T. 10/23/03, pp. 37, 41, 45, 49, 52, 55, 58, 62, 65, 68, 71.)[15]

None of the jurors questioned answered any of the above questions affirmatively. Nor did any of the jurors provide even the slightest suggestion that they had been

_____

15. The above questioning also included the alternate juror. (N.T. 10/23/03, p. 75.)

tainted with any outside information. We also again carefully inquired of each juror as to whether he or she was sure if they could be fair and impartial and each answered affirmatively. (N.T. 10/23/03, pp. 33, 38, 41-42, 46, 49-50, 52, 56, 59, 63, 66, 69, 71.)[16]

After these colloquies, we dismissed juror number 7 from the jury. As a further precautionary measure, the transcript regarding the juror colloquies was sealed and both lawyers and their representatives were ordered not to discuss the case with the media. (N.T. 10/23/03, pp. 72-73, 75.)

## IX. *Sufficiency of Megan's Law Evidence*

Pursuant to a petition filed by the Commonwealth to have appellant designated as a sexually violent predator, a Megan's Law hearing was held on April 6, 2004.[17] Prior to this hearing, Dean Dickson, a licensed psychologist with extensive expertise in the treatment of sex offenders and a member of the Sexual Offenders Assessment Board (SOAB), conducted an assessment of appellant

---

16. The individual colloquy described above was in addition to the general voir dire conducted by the court, prior to the jury's empanelment, whereby all prospective jurors, including those few who had read media accounts of the case, swore that they would consider the case based solely on the evidence and that they had not formed any preconceived opinions about the case. (N.T. 10/20/03, pp. 13-15.)

17. 42 Pa.C.S. §9792 defines a sexually violent predator as a person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.

pursuant to 42 Pa.C.S. §9795.4.[18] In following the statutory definitions and guidelines of 42 Pa.C.S. §9792 and §9795.4, Dickson concluded that appellant should be classified a sexually violent predator.

First, Dickson considered whether appellant had a mental abnormality or personality disorder that would make it likely that he would engage in predatory sexually violent offenses. Dickson testified that appellant had a diagnosed personality disorder that would make him likely to reoffend. Specifically, Dickson found that appellant met the diagnostic criteria for antisocial personality disorder with sexually sadistic features.[19] This diagnosis was supported by appellant's repeated acts and behavior since the age of 11 that were grounds for arrest and conviction, which demonstrated a reckless disregard for the safety of others. These acts included assault, disorderly conduct and numerous instances of burglary. (N.T. 4/6/04, p. 71.) Dickson also stressed that appellant's antisocial personality disorder and extensive criminal history were both significant risk factors for reoffending. (N.T. 4/6/04, p. 75.)

18. Dickson holds a master's degree in clinical psychology. Before being appointed to the Sexual Offenders Assessment Board in 1996, Dickson worked at the Joseph J. Peters Institute in Philadelphia and SCI Graterford where he treated rapists, pedophiles and incest fathers. He also treated juvenile sex offenders at Saint Gabriel's Hall and established a group with the Network of Victim Assistance in Bucks County where he treated men who were on probation and parole for sex offenses. Since his appointment on the SOAB, Dickson has completed approximately 700 assessments pursuant to Megan's Law. (N.T. 4/6/04, pp. 32-34, 38-39, 62, 66, 69.)

19. The essential feature of appellant's antisocial personality disorder was his pervasive pattern of disregard for, and violation of, the rights of others, occurring since at least age 15. (N.T. 4/6/04, p. 71.)

Dickson also found that appellant suffered from sex offense permissive cognitions,[20] as evidenced by a pattern of thought that led appellant to believe he had permission to take advantage sexually of a female who was unconscious from alcohol and the possible administration of a date rape drug. (N.T. 4/06/04, p. 75.) Appellant's sexually permissive behaviors were also evidenced by his insertion of objects into the victim's vagina in front of others, videotaping of the event, and subsequent showing of the video to others for his and their amusement. This was further demonstrated by the fact that appellant showed videos of himself having sex with other females. (N.T. 4/06/04, p. 77.)

Next, Dickson opined that appellant's acts were "predatory," which is defined under section 9792 as "an act directed at a stranger or at a person with whom a relationship has been established or promoted for the primary purpose of victimization." In finding that appellant's conduct was "predatory," Dickson concluded that appellant promoted the relationship with the victim for purposes of victimization throughout the night in question. Specifically, Dickson considered that appellant invited an intoxicated 17-year-old to his home where he provided her with more alcohol, while a video of him having sex was playing. Dickson also noted that a date rape drug may have been used and, importantly, that the evening's events, all orchestrated by appellant, culminated with the victim being unconscious on his futon.

---

20. Sex offense permissive cognitions mean that a person has a set of beliefs and thoughts that predispose him or cause him to look at sex in a certain way. In this case, sexually permissive cognitions mean that appellant saw that he could take advantage of the situation for his own sexual gratification. (N.T. 4/6/04, pp. 204-205.)

Given these facts, Dickson concluded that appellant's acts were directed at the victim to establish or promote a relationship so that he could victimize her.

As mandated by section 9795.4, Dickson also considered and applied numerous assessment factors in determining that appellant was an SVP, which we set forth below:

## Facts of Current Offense

*The nature of the sexual contact*
*with the victim (§9795.4(iii))*

Dickson considered that appellant placed a candle, vodka bottle, shot glass and coat hanger into the victim's vagina. Dickson also noted that several witnesses reported that they saw the victim asleep on a couch and they observed appellant pull her dress and panties aside and insert several objects into her vagina. Dickson also relied upon the victim's statement to the police that she drank from a glass containing orange juice, felt sleepy and passed out, and that she awoke the next day in appellant's bed with no recollection of how she got there. Dickson further noted that there was testimony that the assault was videotaped. (N.T. 4/6/04, pp. 69-70, 78.)

All of these factors were weighed by Dickson in reaching his conclusion that appellant was an SVP.

*Relationship of the individual*
*to the victim (§9795.4(vi))*

Dickson considered that appellant and the victim knew each other prior to the evening of the assault and that they were friends. (N.T. 4/6/04, p. 78.) Dickson explained

that this relationship became predatory in nature because appellant established or maintained the relationship with the victim for the primary purpose of victimization, as evidenced by appellant inviting the victim to his party and deliberately taking advantage of her unconscious state to have sexual relations with her. (N.T. 4/6/04, p. 76.)

*Whether the offense included a display of unusual cruelty by the individual during the commission of the crime (§9795.4(b)(1)(vi))*

In finding that appellant was an SVP, Dickson relied heavily on appellant's display of unusual cruelty. Dickson explained that appellant's placing of objects into the victim's vagina and videotaping these acts for the amusement of others at the party constituted unusual cruelty. While Dickson did not diagnosis appellant as being a sexual sadist, he did find that there was an element of sadism in his exposing the genitals of an unconscious 17-year-old while inserting objects into her vagina as a source of amusement for his party guests. Dickson found such facts reflected that appellant enjoyed the suffering of his victim. Dickson explained that, even though the victim was unconscious, suffering was present in that appellant took advantage of her and had sex with her after mocking and ridiculing her. (N.T. 4/6/04, pp. 81-82.)

Prior Offense History

*The individual's prior criminal record (§9795.4(b)(2)(i))*

Appellant's significant prior criminal record dating back 10 years, with a recent adult conviction for burglary, also weighed heavily in Dickson's opinion that

appellant would reoffend. At the age of 11, appellant was arrested and charged with two counts of simple assault and disorderly conduct. In 2000, while still a juvenile, he was arrested and charged with burglary and related charges and arrested two more times that same year for burglary and related charges. Appellant was adjudicated delinquent on all of these charges. Appellant also has a juvenile probation violation due to drug involvement and multiple placements as a juvenile, including placement at the maximum supervision level. Due to this record, appellant was placed in various residential settings and home and community programs, including Community Service Foundation, Today, Incorporated, and eventually was placed in the custody of Youth Services.

As an adult, in 2001, appellant was again arrested for burglary. In 2002, appellant was arrested and charged with aggravated assault, disorderly conduct and simple assault. The aggravated assault charge was nolle prossed, but appellant was sentenced to county incarceration for two years on the simple assault charge, with probation for the remaining charges. That same year, he was arrested and pled guilty to possession of marijuana and drug paraphernalia. While on probation in 2003, as noted above, appellant was arrested and convicted of burglary and conspiracy.

In relying upon the Hanson and Bussiere meta-analysis, Dickson noted that a risk factor for sexual reoffending is a nonsexual criminal history.[21] Appellant's substantial

---

21. The Hanson and Bussiere meta-analysis refers to an article that examines factors relating to sexual offender recidivism. See R. Karl Hanson and Monique T. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies,* Journal of Consulting and Clinical Psychology, vol. 66 no. 2 (1998).

criminal history, which began at age 11, was a significant factor in Dickson concluding that appellant will reoffend. (N.T. 4/6/04, pp. 71-74, 82; exhibit C-1, Megan's Law hearing.)

*Whether the individual completed any prior sentences (§9795.4(b)(2)(ii))*

Dickson noted that appellant was on probation during the time of the instant assault, which also factored into his opinion that appellant would reoffend. (N.T. 4/6/04, pp. 82-83.)

Characteristics of the Individual

*Age of the individual (§9795.4(b)(3)(i))*

Appellant was 20 years of age at the time he committed the instant offense. Dickson explained that sex offenders under the age of 25 are at a high risk to reoffend compared to older offenders. (N.T. 4/6/04, p. 83.)

*Any mental illness, mental disability or mental abnormality (§9795.4(b)(3)(iii))*

As set forth extensively above, Dickson found that appellant suffered from antisocial personality disorder, as evidenced by appellant's pattern of disregard for, and violation of, the rights of others, commencing at a very young age.

*Behavioral characteristics that contribute to the individual's conduct (§9795.4(b)(3)(iv))*

Regarding general character traits of appellant that supported his opinion, Dickson testified extensively re-

garding appellant's numerous contacts with the criminal justice system beginning at the age of 11. (N.T. 4/6/04, p. 84.) Dickson opined that this background reflects a callous lack of propriety and concern for others. These traits were also displayed in the incident in question, as evidenced by the party at appellant's home in which alcohol and possibly controlled substances were available to minors, and the playing of a graphic videotape of appellant having sex with a woman, culminating with the degrading assault on the victim. (N.T. 4/6/04, pp. 85-86.) Dickson further testified that appellant appears to have boundary issues in terms of sexual issues, as well as very poor overall judgment based upon his criminal record and other factors, all of which supported his opinion that appellant is likely to reoffend. (N.T. 4/6/04, p. 86.)

Appellant called Dr. Pogos H. Voskanian, a psychiatrist, to offer his opinion that appellant was not an SVP. (N.T. 4/06/04, p. 233.) Voskanian denied that appellant maintained a relationship with the victim for the primary purpose of victimization. (N.T. 4/06/04, pp. 240-41.) During cross-examination, Voskanian admitted that appellant meets the diagnostic criteria for antisocial personality disorder. (N.T. 4/06/04, p. 271.)

Voskanian also denied that this assault included displays of unusual cruelty and suggested that appellant's insertion of a hanger into the victim's vagina to remove the shot glass was "considerate" and "demonstrated empathy." Voskanian also testified that inserting bottles, candles and shot glasses into an unconscious 17-year-old in full display of her friends while it was being videotaped was not cruel. (N.T. 4/6/04, pp. 264, 282-83.)

As the fact-finder, we chose to reject Voskanian's opinion.

## X. *Sentencing Overview*

The sentencing guideline ranges for rape and involuntary deviate sexual intercourse (IDSI) were: mitigated range—54 months; standard range—66 to 84 months; aggravated range—96 months. The sentencing guideline ranges for obscene sexual materials were: mitigated range—3 months; standard range—6 to 16 months; aggravated range—19 months.

After considering the pre-sentence investigation report, facts and circumstances of the crime, effect of the crime on the victim, and the particular heinousness of the crime, we determined that a sentence outside of the sentencing guidelines was appropriate. In his statement to the court, and in the face of overwhelming evidence to the contrary, appellant continued to deny his criminal conduct and failed to exhibit even the slightest remorse. We also took this into account in imposing a sentence outside of the suggested guideline range.

Accordingly, appellant was sentenced to nine to 18 years for the rape and IDSI convictions to run concurrently and six months to four years on the obscene sexual materials conviction to run consecutively to the rape and IDSI sentence for a total sentence of nine and one-half to 18 years. In fashioning this sentence, we considered the protection of the public, the gravity of the offense, the rehabilitative needs of appellant, and appellant's complete lack of contrition and continued refusal to accept responsibility for the harm he had inflicted. (N.T. 4/6/04, pp. 315-18.) We also considered the circumstantial

evidence indicating that appellant or someone acting in concert with him drugged the victim and that the act was premeditated, calculating, callous, and done to take advantage of an unconscious 17-year-old girl. We also took into account the direct, unrefuted evidence of appellant's obstruction of justice after the crime was committed, evidenced by the destruction of the videotape at his behest and his instructing witnesses to lie. We also considered the humiliation, embarrassment, and shame that the victim suffered, and continues to suffer, and the particular heinousness of the crime, including appellant's enjoyment of watching someone suffer, and the dignity that appellant stole from the victim. (N.T. 4/6/04, pp. 315-19.)

## LEGAL ANALYSIS

As noted above, appellant asserts that in the course of a six-day trial and one-day Megan's Law proceeding and sentencing, that over 150 instances of error occurred. For the sake of clarity, we have attempted to distill appellant's allegations of error into separate categories.

### I. *Ineffective Assistance of Counsel*

Appellant claims that a new trial is mandated based on a myriad of ineffective assistance of counsel claims that include general evidentiary issues, failure of trial counsel to ask certain questions or raise objections, failure of trial counsel to rebut certain testimony, and failure to move for a mistrial. See appellant's concise statement, ¶¶1-25.

When analyzing claims of ineffective assistance of counsel, we begin with the presumption that counsel was

effective.[22] *Commonwealth v. Pappas,* 845 A.2d 829, 844 (Pa. Super. 2004). See also, *Commonwealth v. Miller,* 572 Pa. 623, 646, 819 A.2d 504, 517 (2002). A defendant establishes ineffective assistance of counsel when he demonstrates that: (1) the underlying claim is of arguable merit; (2) that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the defendant's interest; and (3) that counsel's action or inaction was prejudicial to the client. *Pappas,* 845 A.2d at 844. For an action or inaction by counsel to be considered prejudicial to the client, there must be a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Johnson,* 572 Pa. 283, 300, 815 A.2d 563, 573 (2002). All three prongs of the above test must be satisfied. If a defendant fails to meet even one prong of the test, his conviction will not be reversed on the basis of ineffective assistance of counsel. *Pappas,* 845 A.2d at 844.

Appellant has raised 25 instances where he believes that trial counsel was ineffective. We have attempted to summarize related claims and address them as follows:

Appellant alleges trial counsel was ineffective due to her preparation of, and questioning of, the victim. Specifically, appellant complains that counsel failed to properly prepare the victim, call her in the defense case, illicit testimony regarding the consensual nature of the incident and to prepare her for her "recantation." See concise statement, ¶¶2-3.

---

22. As the presiding judge, we observed that trial counsel presented a vigorous defense throughout trial that focused on appellant's only viable defense that the victim was conscious.

First, contrary to appellant's assertions, trial counsel did meet with the victim on two occasions: once at counsel's office and once before trial. (N.T. 8/16/04, p. 90.) Second, this issue must be viewed in its proper context which is that a 17-year-old girl, who for a year adamantly stated she had been unconscious, decided on the eve of trial to change her story. Trial counsel weighed this sensitive situation and made a judgment that she did not want to create the appearance that she was influencing or coaching the victim in any way. Counsel explained that she also believed that, as trial counsel, it was best to distance herself from the victim, and that frequent meetings with the victim could create the appearance that the victim was not independent. These are certainly reasonable explanations given the circumstances of this case. (N.T. 8/16/04, p. 93.) Courts will not second-guess trial counsel's trial tactics, so long as there is a reasonable basis for what trial counsel did or did not do. *Commonwealth v. Rivers*, 567 Pa. 239, 252, 786 A.2d 923, 930 (2001).

Appellant also seems to forget that the victim did, in fact, testify in his favor in both the Commonwealth's case in chief and during an extensive examination conducted by trial counsel, wherein she stated that she consented to the entire incident. (See generally, N.T. 10/22/03, pp. 167-322.) In light of all of the above, appellant's claim that trial counsel was ineffective for failing to prepare or call the victim as a witness is meritless, bordering on frivolous.

Appellant also claims trial counsel was ineffective for failing to illicit the victim's testimony that the post-futon intercourse was consensual. See concise statement, ¶1. As set forth above, this allegation is simply unsupported

by the record as the victim plainly testified that all interaction between her and appellant was consensual. (N.T. 10/22/03, p. 188.)

Appellant next asserts numerous claims of ineffective assistance of counsel regarding trial counsel's failure to move for a mistrial, or curative instructions in response to statements made by the assistant district attorney during closing argument. See concise statement, ¶¶5, 6, 9, 11, 13, 17. Claims 5 and 6 pertain to the sequence of events (described in detail above) and the prosecutor's alleged misstatement of this sequence. Appellant complains about the prosecutor's statements that the glass of orange juice was ingested by the victim after she returned from the office with appellant, and asserts that the prosecutor purposely fabricated this statement to "save" its sequence of events so to be consistent with Dr. Cohn's estimation that the effects of a date rape drug take place 15-20 minutes after ingestion. These claims are meritless for numerous reasons.

The conduct of the prosecutor at closing argument is circumscribed by the concern for the right of the defendant to a fair and impartial trial. *Commonwealth v. Correa,* 444 Pa. Super. 621, 627, 664 A.2d 607, 610 (1995). It is well established that a prosecutor's remarks to the jury may contain fair deductions and legitimate inferences from the evidence presented during testimony. *Commonwealth v. Visconto,* 301 Pa. Super. 543, 554, 448 A.2d 41, 46 (1982); *Commonwealth v. Reed,* 400 Pa. Super. 207, 229-30, 583 A.2d 459, 470 (1990). It is improper for a prosecuting attorney to make reference to matters which are not in evidence or supported by inferences to be drawn from the evidence. *Correa,* 444 Pa. Super. at 630, 664 A.2d at 612. However, even if it is

established that the prosecutor made a misstatement of fact, the appellant still must prove that he was prejudiced in order to succeed on an ineffective assistance of counsel claim. *Commonwealth v. Harris,* 578 Pa. 377, 398-99, 852 A.2d 1168, 1180 (2004) (appellant did not show that he was prejudiced by the prosecutor's misstatement and thus, trial counsel cannot be said to have given ineffective representation for failing to correct it). Appellant has failed to demonstrate how he was prejudiced, considering the overwhelming evidence that was presented to support appellant's convictions of guilt.

Here, there is evidence of record to support the time line suggested by Dr. Cohn, that is, that a date rape drug takes 20 minutes to take effect. As previously noted, in the victim's initial statement to police (exhibit C-2), she indicated that, after arriving at appellant's house, she drank a glass of orange juice and then stated, "10-20 minutes later I went to lay down in the bed . . . about 5 minutes after I laid down I passed out completely." Moreover, the Commonwealth introduced admissions made by appellant wherein he admits that "GHB" and "K," both date rape drugs, were used on the night in question. (N.T. 10/23/03, p. 113.) Given this evidence, appellant's assertions that the prosecutor fabricated a time line to "save" their "expert opinion" on the potentially dispositive date rape drug issue is meritless.

Finally, in our instructions to the jury, we explained that the jury was to decide the case based on the evidence as it was presented from the witness stand, that the closing arguments of counsel were not to be considered evidence, and that the jurors were to be the sole judges of the facts. (N.T. 10/28/03, pp. 31, 41.) Therefore, any error from the prosecutor's misstatement of fact

was cured by the court's instruction to the jury. *Commonwealth v. Jacobs,* 556 Pa. 138, 158-59, 727 A.2d 545, 555 (1999) (any error from prosecutor's misstatement of evidence was overcome by trial court's general instruction that arguments of counsel were not evidence and that the jurors were the sole finders of fact).

Appellant next argues that trial counsel was ineffective for failing to move for a mistrial or, in the alternative, for a curative instruction, based on the Commonwealth's closing argument that the victim's body was shaking as a result of a date rape drug where there was no testimony to that effect. See concise statement, ¶9. This assertion lacks merit because there was both testimony that the victim's body was shaking and Dr. Cohn opined that such shaking was consistent with ingestion of a date rape drug. (N.T. 10/22/03, pp. 69-70, 83; N.T. 10/27/03, p. 46.)

Appellant next argues that trial counsel was ineffective for failing "to move for a mistrial or a curative instruction based on the prosecutor's statements in opening and closing arguments about pressure and fear allegedly exerted on various witnesses." See concise statement, ¶11. As these comments were supported by the record at trial, trial counsel was not ineffective. Vladimir Pevzner testified about a meeting with appellant in which appellant told him how to testify and that he had destroyed evidence. In short, appellant asked that Pevzner suborn perjury and admitted to destroying evidence. Pevzner also acknowledged he was afraid of appellant and his family. (N.T. 10/27/03, pp. 107-108.) Karina Danilchenko indicated that she did not tell the truth in the Grand Jury because she was scared. (N.T. 10/21/03, pp. 174-204.) Additionally, the victim's last minute re-

cantation, after meeting with appellant's family, created a fair inference to support the prosecutor's statements.

Appellant next argues that trial counsel was ineffective by stating in opening argument that the victim "had a suspicion at the time that when she went to pick up that glass, maybe there was some drugs in it." In raising this issue, appellant asserts that "not a single person, not a single witness, had any suspicion about a drug in a drink." See concise statement, ¶4. As trial counsel's comments were supported by, and in direct response to, evidence at trial, this claim is also meritless.

The victim did in fact have a suspicion that someone had put something in her glass of orange juice. Even after her last minute recantation regarding her state of consciousness, the victim testified that, immediately after she drank the juice, people at the party laughed and she became "concerned" that it had been "tampered with." (N.T. 10/22/03, p. 181.) In her first statement to police (exhibit C-2), the victim indicated that, 15-25 minutes after drinking the orange juice, she "passed out completely." Given the facts of record, trial counsel's remarks were entirely appropriate.

Appellant's assertion that no one had any suspicion about a date rape drug is also directly refuted by his own words. Steven Carnivale, appellant's cell mate, testified that appellant admitted to him that "GHB" and "K" (common date rape drugs) had been used on the night in question and that, if it were not for the victim's friends making such a big deal about the incident, "she never would have known about it." (N.T. 10/23/03, p. 113.)

Appellant next claims that trial counsel was ineffective because she failed to move to strike the Common-

wealth's expert pharmacologist/toxicologist's testimony after the close of evidence because such testimony was based on a 15-25 minute time line from ingestion of the orange juice until the time the victim passed out on the futon. See concise statement, ¶7. We have previously extensively discussed this sequence of events and again note that a portion of the victim's testimony and her initial statement to police (exhibit C-2) are consistent with this time line. Indeed, in C-2 the victim described a 15-25 minute time line from ingesting the orange juice to when she passed out, the exact time line Dr. Cohn stated it takes for date rape drugs to take effect. As such, we are at a loss to understand how Dr. Cohn's testimony should have been stricken, and appellant does not explain how other portions of Dr. Cohn's testimony were inadmissible.

Appellant also contends that trial counsel failed to move to strike Dr. Cohn's expert opinion on alcohol as a non-causative factor, where such testimony was not given within a reasonable degree of medical certainty. See concise statement, ¶15. In responding to this allegation, trial counsel explained:

"I think it is almost meaningless when an expert called by one party, prepped and reviewed by one party, is put on the stand. If I had objected, I am sure the next question would have been 'and are all of your opinions to a reasonable degree of medical certainty' and he would have said 'yes.' I did not object, but I don't think that is a particularly meaningful objection." (N.T. 8/16/04, p. 111.)

As trial counsel's explanation is entirely reasonable, this claim is also without merit. (N.T. 8/16/04, p. 113.)

Appellant next asserts trial counsel failed to call a medical expert on the victim's unconsciousness; failed to present expert evidence on alcohol-induced blackout; and failed to present an expert witness on the date rape drug. In short, appellant alleges an expert should have been called to render an opinion that the victim was conscious. See concise statement, ¶¶12, 20, 25.

Appellant raises these criticisms despite the fact that his current counsel also failed to present any of these witnesses, experts or otherwise, in post verdict proceedings to establish that the victim was conscious. Current counsel's bold, unsupported statements fall far short of establishing a record of ineffective assistance of counsel. Moreover, even if appellant was able to produce such evidence, appellant has not explained how these potential experts' testimony would consider and resolve the fact that eyewitnesses to the event testified the victim was unconscious, and the victim's numerous statements given immediately after the event that she was "passed out completely."

Appellant also argues that trial counsel failed to object to the prosecutor's leading question to witness Pevzner as it allegedly violated the court's in limine ruling. See concise statement, ¶8. (N.T. 10/27/03, p. 124; N.T. 8/16/04, p. 84.) In raising this claim, appellant has completely mischaracterized the record.

By way of brief background, because Pevzner was being relocated by law enforcement authorities and because a prior prosecution witness, Carnivale, had acknowledged his connection with organized crime, trial counsel requested, and we did in fact order, that the word "relocated" not be used in questioning Pevzner as it may cause an unfair inference that the "relocation" was due

to some type of threat by appellant. We did, however, permit the prosecution to illicit that Pevzner had moved to another jurisdiction. The prosecution followed this instruction and asked Pevzner whether he had been transferred out of the jurisdiction. Contrary to appellant's assertion, the word "relocated" was never used, and it is utterly meritless to suggest that trial counsel was ineffective for failing to object to this question, which in all parts comported with the court's directive.

The remainder of appellant's ineffective assistance of counsel claims are either unsupported by the record or are so entirely meritless that we address them only briefly below.

For instance, in concise statement ¶16, appellant argues that trial counsel failed to argue reasonable doubt in closing argument. This claim is directly refuted by the record (see N.T. 10/28/03, pp. 37-39, 42-43) and is one of many examples of the frivolous nature of appellant's claims and his current counsel's willingness to waste judicial resources.

Appellant also claims, without offering any legal authority, that trial counsel was ineffective for failing to move to strike the victim's statement to police. (Exhibit C-2.) See concise statement, ¶10. While the basis for this claim is barely discernible, appellant claims that the evidence presented at trial proved that the statement was "falsely chaste, deliberately, fatally and deceivingly incomplete and truncated." Whatever this means, it is well settled that it is entirely up to the jury to consider what weight to give to this statement.

Appellant also claims trial counsel was ineffective for failing to object to leading questions of Carnivale and

Shapershteyn. See concise statement, ¶¶14, 21. We have reviewed those questions and the record as a whole and find that even if trial counsel objected and such objections were sustained, the outcome of this case would not have changed.

Appellant also complains that trial counsel was ineffective for failing to ask for a hearing on alleged Grand Jury abuses and failure to seek dismissal of the information due to discovery abuses. See concise statement, ¶¶18, 22. Appellant makes these claims without even the slightest hint as to the specifics of such alleged abuses. These allegations are also meritless.

Appellant has not alleged that the overwhelming evidence presented against him at trial proving his guilt on the rape, IDSI, and other charges (*e.g.,* eyewitness testimony, victim's statements, destruction of the video) carried with it any type of taint from alleged Grand Jury "abuse." Moreover, our review of the record reflects that all of our discovery rulings were proper, and even if we erred, such rulings (*e.g.,* belated production by the Commonwealth of phone records from appellant's cell phone) would have in no way affected the outcome of this case. (N.T. 10/27/03, pp. 109-13.)

## II. *Alleged Juror Taint*

Appellant next claims error in our denial of his motion for a mistrial based upon alleged juror taint regarding "Russian mafia rumors." See concise statement, ¶26.

In cases in which there is an allegation that jurors have been "tainted" and no actual prejudicial material has been unearthed, a precautionary instruction for jurors to base their decision solely on evidence heard at trial is suffi-

cient to cure any taint. *Commonwealth v. Maloney,* 409 Pa. Super. 516, 527, 598 A.2d 543, 548 (1991). However, if the existence of a potentially prejudicial, extraneous influence has been established by competent juror testimony, the trial judge must assess the prejudicial effect of such influence. In determining the reasonable likelihood of prejudice, the judge should consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." *Commonwealth v. Neff,* 860 A.2d 1063, 1069 (Pa. Super. 2004).

A decision denying a mistrial is a matter addressed primarily to the discretion of the trial court and will only be reversed if the trial court committed an abuse of discretion or legal error in denying the request. *Gatto v. Kisloff,* 437 Pa. Super. 328, 331, 649 A.2d 996, 997 (1994). "A trial court need only grant a mistrial where the alleged prejudicial event may reasonably be said to have deprived the moving party of a fair and impartial trial." *Commonwealth v. Tharp,* 574 Pa. 202, 225, 830 A.2d 519, 532-33 (2003).

In *Commonwealth v. Lee,* 261 Pa. Super. 48, 395 A.2d 935 (1978), during voir dire, a prospective juror stated that she was reluctant to serve on the jury because she lived in the same area as the defendant, had overheard another prospective juror mention that the defendant had friends and relatives who were "very tough," and feared reprisals. The comments had not been directly made to this juror, rather, she overheard them, and she did not know whether other prospective jurors had heard such

comments. The lower court excused this juror and then proceeded to examine the issue of taint.

First, the entire panel was asked whether anyone had heard one of the prospective juror's remark that they knew something about the defendant. None answered in the affirmative. Thereafter, the juror who had made the offending remark was also excused and brought before the court in chambers. This person indicated that while sitting among other prospective panelists, he had whispered to his neighbor that he knew the defendant, his friends, and relatives to be miscreants. This person made it clear that his neighbor, to whom he had made these comments, was not selected as a part of the jury. The juror did not know if anyone else overheard his comment. *Id.* at 50-51, 395 A.2d at 937-38.

After defense counsel requested that the entire panel be excused because of alleged taint, the court questioned each remaining juror on whether they had heard any comment or reference about the defendant or anybody connected with the defendant. After each prospective juror answered in the negative, the court found that the remark had not reached the selected panel and denied the defense's motion for a mistrial. *Id.*

On appeal, the defendant argued that the decision was erroneous and that he had been prejudiced. He also argued that a question remained as to how far the remark had spread. The Superior Court found itself "at a loss to speculate what more could have been accomplished to ferret out whether any of the jurors in this case had heard the remark," found no prejudice, and nothing in the record to indicate a "fixed bias was planted in the mind of any juror to require a mistrial." *Id.* at 51-52, 395 A.2d at 937.

*Lee* is factually similar to our case in that juror number 7 heard an unknown person state something negative about the appellant and his family. As in *Lee,* juror number 7 was dismissed. We also extensively questioned juror number 7 wherein he stated that he did not believe the comment was made in the presence of any other jurors. Thereafter, also as in *Lee,* each juror was individually questioned about whether they had heard any jokes or comments relating to the appellant. We also inquired about whether any juror had read, heard, or otherwise been exposed to any media accounts or heard any fellow jurors talking about media accounts. None answered in the affirmative. Finally, we again confirmed that all remaining jurors would continue to view the case based solely on the evidence presented in court and deliberate fairly and impartially. This inquiry was at least as thorough as the one upheld in *Lee,* and thus, appellant was not deprived of a fair and impartial trial.[23]

## III. *Evidentiary Rulings*

Appellant next raises over 60 issues of error regarding evidentiary rulings. See concise statement, ¶¶26-92. It appears as if appellant's counsel simply regurgitated every evidentiary ruling against his client and raised it

---

23. In addition to the extensive inquiry above, we note that an original voir dire was conducted of the entire jury panel where we thoroughly questioned prospective jurors to ensure that a fair and impartial jury was selected. For example, we asked whether anyone had seen or heard any type of media coverage regarding this matter. To those prospective jurors who indicated they had heard media coverage, we inquired whether they would be able to put such information out of their minds and judge the case fairly and impartially based on the evidence. All answered this question in the affirmative. (N.T. 10/20/03, pp. 2, 13-15, 66-68.)

as an issue for appellate review. Many of these claims are vague, ambiguous, and indecipherable.

Evidentiary rulings are committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Johnson,* 556 Pa. 216, 242, 727 A.2d 1089, 1102 (1999). The standard of review in assessing an evidentiary ruling of a trial court is extremely narrow. "An abuse of discretion occurs when a trial court, in reaching its conclusions, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will." *Commonwealth v. Brown,* 839 A.2d 433, 435 (Pa. Super. 2003). In short, an accused is entitled to a fair trial, not a perfect trial. *Commonwealth v. Drummond,* 775 A.2d 849, 853 (Pa. Super. 2001).

The Commonwealth bears the burden of establishing the harmlessness of the error. This burden is satisfied when the Commonwealth is able to show that: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Laich,* 566 Pa. 19, 29, 777 A.2d 1057, 1062-63 (2001).

With these standards in mind, we substantively address only a smattering of appellant's evidentiary claims so that the Superior Court has a sense of the meritless

nature of these allegations. We will not address all 60 evidentiary claims raised by appellant.

In concise statement, ¶33, appellant contends that we erred in ruling that Karina Danilchenko could testify that she was scared when she testified in the Grand Jury. In the Grand Jury proceeding, Danilchenko indicated that appellant only touched the victim's thigh, whereas at trial she stated that appellant had inserted a shot glass in her vagina. (N.T., 10/21/03, p. 192.) Given this enormous discrepancy in testimony, it was certainly proper to allow the prosecutor to ask questions of this witness to explain this discrepancy in order to explain why she had lied in her Grand Jury testimony. Moreover, Danilchenko's comments about being scared in the Grand Jury had nothing to do with appellant.

In concise statement, ¶36, appellant asserts that we erred in refusing to "exclude prior bad acts brought out in Vladimir Pevzner's testimony, *i.e.,* that the defendant and Igor Khovalya told him and other witnesses what not to say when they went before the Grand Jury." Evidence tending to prove that appellant and/or his friend, acting on his behalf, approached a witness and asked that witness to color their testimony in the Grand Jury is, of course, highly relevant to appellant's state of mind. To suggest that this evidence should have been excluded is absurd.

Appellant alleges several errors concerning the admission of testimony by witnesses that the victim was unconscious. See concise statement, ¶¶37, 49, 50, 73. Because these observations fit into the category of proper lay witness testimony, we address them simultaneously.

Pa.R.E. 701 allows testimony by a lay witness regarding opinions or inferences which are rationally based on

the perception of the witness, helpful to a clear understanding of the witness testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Observations that a person is unconscious fit squarely into this rule. See *Commonwealth v. Ragan,* 438 Pa. Super. 505, 512, 652 A.2d 925, 928 (1995) (lay witness can give an opinion as to whether a person was intoxicated); *Travellers Insurance Co. v. Heppenstall Co.,* 360 Pa. 433, 440, 61 A.2d 809, 813 (1948) (lay witness can give opinion as to person's physical condition). Given this precedent, testimony that the victim was unconscious was perfectly proper.

Appellant next claims error in our allowing the Commonwealth to cross-examine the victim regarding her Grand Jury testimony and statements. See concise statement, ¶43. Given the fact that the victim recanted her story on the eve of trial, her Grand Jury testimony and statements indicating she was unconscious were admissible for impeachment under Pa. R.E. 613 and as substantive evidence under Pa.R.E. 803.1(1).

Next, appellant claims we erred in limiting the cross-examination of Vladimir Pevzner by precluding cross-examination of Pevzner on other charges that had previously been dismissed by another judge of this court for unrelated reasons. See concise statement, ¶44. As these dismissed charges concerned a collateral matter unrelated to appellant, this ruling was well within our discretion.

Next, appellant argues that we erred in limiting the cross-examination of Steven Carnivale to the charges pending against him, the amount of cocaine he was accused of distributing (550 kilograms), his cooperation

with law enforcement and his pending sentencing "deals" for his cooperation with the United States Attorney's Office. See concise statement, ¶45. This line of questioning was more than sufficient to establish Carnivale's possible motive to falsely implicate appellant. We precluded cross-examination regarding the specific facts and circumstances surrounding the offenses Carnivale was charged with, as these facts were collateral, unrelated to this case and simply not relevant. As such, we acted well within our discretion.

Concise statement, ¶46, relates to our ruling on an alleged leading question of Karina Danilchenko. Appellant has not explained how our ruling in any way affected the outcome of the trial or was manifestly unreasonable. Indeed, given the reluctance of many of the witnesses, we allowed leading questions to be asked by both the prosecutor and appellant's counsel. As these types of rulings are well within our discretion, this claim is also meritless.

Concise statement, ¶47, asserts error in our overruling the defense objection to the questioning of a witness as to his observation of the victim's reaction to a phone conversation. As this question asked the witness what they observed, there was no error.

In concise statements, ¶¶48, 51-72, 74-83, 85-92, appellant asserts an additional 41 issues of alleged evidentiary errors. These issues range from rulings on hearsay and the form of questions to the admissibility of expert testimony and photographs. As these issues of alleged error are a continuation of meritless claims where we simply exercised our broad discretion, we will not specifically address each remaining claim. Judicial resources simply do not permit such a review. We note, however,

that each of these issues reflects that either the proper ruling was made or the admitted evidence was cumulative of other untainted evidence. In either case, the properly admitted evidence of guilt was so overwhelming that such rulings were harmless and in no way affected the outcome of the trial. We stress again that evidentiary rulings, such as those concerning hearsay and the form of questions, are committed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of that discretion. *Commonwealth v. Johnson,* 556 Pa. 216, 242, 727 A.2d 1089, 1102 (1999).

## IV. *Motion To Quash Information and Demurrer*

Concise statement, ¶38, questions the denial of appellant's motion to quash Count 7 pertaining to the charge of obscene and sexual materials. In concise statement, ¶84, appellant also claims error from our denial of a demurrer to the same charges.

"The decision to grant a motion to quash a criminal information or indictment 'is within the sound discretion of the trial judge and will be reversed on appeal only where there has been a clear abuse of discretion.'" *Commonwealth v. Lebron,* 765 A.2d 293, 294 (Pa. Super. 2000). The court must determine whether a prima facie case of the charges had been established. "The prima facie standard requires that the Commonwealth produce evidence of the existence of each and every element of the crime charged; consequently, absence of evidence as to the existence of a material element is fatal." *Commonwealth v. Ripley,* 833 A.2d 155, 159-60 (Pa. Super. 2003). "Neither the adequacy nor competency of the Commonwealth's evidence can be tested by a motion to

quash the information." *Commonwealth v. Finley,* 860 A.2d 132, 135 (Pa. Super. 2004).

The standard for reviewing a trial court's decision to grant or deny a demurrer is plenary. *In re Estate of Burger,* 852 A.2d 385, 388 (Pa. Super. 2004). The standard in ruling on a motion for demurrer is whether the evidence of record and inferences reasonably drawn from the record could support a finding of guilt beyond a reasonable doubt. *Commonwealth v. Carroll,* 443 Pa. 518, 278 A.2d 898 (1971). The motion should be granted only if the court determines that there is no factual question to be presented to the jury. *Commonwealth v. Mathious,* 237 Pa. Super. 522, 352 A.2d 172 (1975).

Prior to our ruling on the motion to quash the obscene and sexual materials charge, the Commonwealth proffered that 16-year-old Marianna Visnadul testified at the preliminary hearing that appellant inserted a videotape at the party, depicting him engaging in sexual relations with a female. (N.T. 10/21/03, p. 14.) The evidence presented at trial also reflected that appellant displayed to minors a video of himself having sex. (N.T. 10/24/03, p. 108.)

Obscene and Other Sexual Materials, 18 Pa.C.S. §5903(c)(1), states that:

"No person shall knowingly disseminate . . . explicit sexual materials to a minor. As used in this subsection, explicit sexual materials means materials which are obscene or any image of a person or portion of the human body which depicts nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors.

" 'Harmful to minors' means that quality of any description or representation, in whatever form, of nudity,

sexual conduct, sexual excitement, or sadomasochistic, when it:

"(i) predominantly appeals to the prurient, shameful, or morbid interest of minors; and (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and (iii) taken as a whole, lacks serious literary, artistic, political, educational or scientific value for minors."

We have no hesitation in stating that appellant's pornographic home videos of himself having sex with women shown to minors, and the subsequent showing of his assault on the victim, clearly meet elements set forth above, both at the motion to quash and demurrer stage.

### V. *Jury Instructions*

Next, appellant claims that the trial court erred in its instructions on "recklessness," "momentary lapse," and "consciousness." See concise statements, ¶¶40-42.

"The primary duty of a trial judge in instructing a jury is to clarify the issues so that the jury is able to comprehend the question they are to decide." *Johnson v. City of Philadelphia,* 808 A.2d 978, 980 (Pa. Commw. 2002) (citing *Chicchi v. SEPTA,* 727 A.2d 604, 609 (Pa. Commw. 1999)). Where the jury instruction fairly and accurately apprises the jury of the relevant law, a new trial is not warranted. *Id.* A jury instruction, when considered in its entirety, must be not only erroneous but also prejudicial to the complaining party to constitute reversible error.

A trial court has broad discretion in phrasing jury instructions, and the scope of review in examining those

instructions is to determine whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case. *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said, or unless there is an omission in the charge which amounts to fundamental error." *Gaylord ex rel. Gaylord v. Morris Township Fire Department,* 853 A.2d 1112, 1116 (Pa. Commw. 2004) (quoting *Voitasefski v. Pittsburgh Rys. Co.,* 363 Pa. 220, 226, 69 A.2d 370, 373 (1949)). A new trial should not be granted on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental. *Id.*

Appellant first claims that the trial court erred in its instruction on "recklessness" with respect to whether he acted knowingly in sexual relations. See concise statement, ¶40. The trial court defined recklessly as follows:

"A person recklessly disregards a woman's unconsciousness if he consciously disregards a substantial and unjustifiable risk that the woman is unconscious. The risk disregarded must be the sort of risk that is grossly unreasonable for the defendant to disregard." (N.T. 10/28/03, p. 17.)

18 Pa.C.S. §302(b)(3) states that:

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross de-

viation from the standard of conduct that a reasonable person would observe in the actor's situation."

Because the trial court's instructions are virtually identical to the definition provided by law, we find appellant's contention is without merit.

Appellant next complains our instruction on consciousness was improper. See concise statement, ¶42. We defined this term as follows:

"The state of being conscious; awareness of one's own feelings; what is happening around one. The term consciousness includes having a feeling or knowledge of one's own sensations, feelings or of external things; knowing or feeling that something is or was happening or existing; aware; cognizant; able to feel and think; in the normal waking state." (N.T. 10/28/03, p. 14.)

We further instructed that when a person is unconscious, the person lacks the conscious awareness they would possess in the normal waking state. (N.T. 10/28/03, p. 14.)

This definition, from Webster's New World Dictionary Second College Edition, adequately apprised the jury of the element of unconsciousness as it relates to the charge of rape, 18 Pa.C.S. §3121(a)(3), and involuntary deviate sexual intercourse, 18 Pa.C.S. §3123(a)(3). Moreover, *Commonwealth v. Erney,* 548 Pa. 467, 472-73, 698 A.2d 56, 59 (1997), referenced this same definition in determining the meaning of unconsciousness as used in section 3121(3). See also, *Commonwealth v. Widmer,* 560 Pa. 308, 323, 744 A.2d 745, 753 (2000) ("a person is unconscious for purposes of [18 Pa.C.S. §3121(3)] when they lack the conscious awareness they would possess in the normal waking state").

Appellant next contends that the trial court erred on its momentary lapse instruction with respect to unconsciousness. See concise statement, ¶41. Appellant has failed to point out where, in the voluminous notes of testimony, the instruction was given. The record does not contain an instruction on "momentary lapse." Therefore, we are unable to address this issue.

## VI. *Alleged Trial Court Errors*

Appellant next asserts that we erred in not granting and sustaining the defense objection to the Commonwealth's closing argument that Carnivale had testified that appellant destroyed the videotape. See concise statement, ¶29. This claim is also raised in concise statement, ¶24, in the context of ineffective assistance of counsel. This is yet another blatant misrepresentation of the record. Carnivale testified as follows:

"*Prosecutor:* And you had mentioned that [appellant] told you that this incident was videotaped?

"*Carnivale:* Yes.

"*Prosecutor:* Did [appellant] tell you what had happened to the videotape?

"*Carnivale:* He said that his friend burned that tape and eight other tapes." (N.T. 10/23/03, p. 117.)

We cite directly to the record here to illustrate the unending frivolous issues raised by appellant that are directly contradicted by the record.

Appellant further claims that the trial court erred in overruling the defense motion for mistrial based on the Commonwealth's closing argument concerning organized crime. See concise statement, ¶30. Specifically,

appellant references the following statement made by the prosecutor:

"And who do you think that [appellant] is going to open up to in prison? Somebody like Carnivale. They were buddies. [Appellant] asked him all kinds of questions about the Italian mafia then they started talking about their case." (N.T. 10/28/03, p. 69.)

Appellant's reference to the prosecutor's statement which he characterizes as "outrageous" is taken completely out of context.

Specifically, in his concise statement, appellant first cites to a comment made by the court in reference to *his* alleged connection to the Russian mafia, an allegation strictly prohibited by this court, which was complied with at all points during the trial. The prosecutor's remark appellant now refers to had nothing to do with appellant's alleged ties to organized crime, but were made in context of Carnivale, a witness who testified against appellant and who everyone agreed was connected to organized crime. The prosecutor's comment in no way stated or even inferred that appellant was connected to organized crime, but rather, suggested that appellant had asked Carnivale about his involvement with the Italian mafia.

"The test to be applied at motion for mistrial is whether improper evidence was admitted at trial, such as would so compromise the fact-finder that it would be unable to remain impartial, thereby prejudicing the appellant beyond a reasonable doubt." *Commonwealth v. Dean,* 300 Pa. Super. 86, 91, 445 A.2d 1311, 1313 (1982). We fail to recognize how a brief mention of how appellant and Carnivale struck up a conversation would so compromise the fact-finders that they would be unable to re-

main impartial, thereby prejudicing the appellant beyond a reasonable doubt.

Appellant next alleges that the trial court erred in overruling the defense objection to the prosecutor's closing argument that allegedly falsely claimed that the victim had never told the Commonwealth her recanted version of the events. See concise statement, ¶31. Appellant fails to cite to the record for this vague proposition. After pouring through the notes of testimony, we find that appellant has once again misstated what occurred at trial.

In closing argument, the prosecutor stated:

"So then she gets a lawyer, and then she won't talk, *doesn't talk to me, doesn't talk to the police.* We don't hear her version until she gets on that witness stand, and that's when we hear her story. And we gave her immunity so we could all hear her story and hear all of the circumstances surrounding this, her new story about she was lying the whole time." (N.T. 10/28/03, pp. 63-64.) (emphasis added)

As the prosecutor's closing arguments are entirely supported by the trial testimony, this claim is also meritless.

Appellant alleges further error, claiming that the prosecution made improper and inflammatory statements to the press and that we erred in denying the defense motions to dismiss and for other relief. Appellant characterizes the Commonwealth's conduct as a "deliberate pollution of the judicial process and the jury pool with unsupported statements concerning organized crime." See concise statement, ¶32. There is not one shred of evidence to

support this statement. Indeed, we made concerted successful efforts throughout the trial to exclude any and all references to Russian mafia.

Appellant also contends that the trial court erred in denying defense motions to dismiss due to the Commonwealth's "Grand Jury and investigative abuse, which threatened, coerced, and intimidated defense witnesses" and deprived appellant of a fair trial. See concise statement, ¶39. Again, appellant offers no evidence to support this allegation and, indeed, there is no such evidence in the record before us.

## VII. *Weight and Sufficiency of Evidence*

Appellant next claims that the verdicts on IDSI and rape were against the weight of the evidence (concise statement, ¶34) and that there was insufficient evidence to support these convictions. (Concise statement, ¶35.)

The critical distinction between a claim challenging the sufficiency of evidence and a claim challenging the weight of evidence is that a motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict, but asserts that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. See *Commonwealth v. Widmer,* 560 Pa. 308, 319-20, 744 A.2d 745, 751-52 (2000). A claim challenging the sufficiency of the evidence asserts that there is insufficient evidence to support at least one material element of the crime for which appellant has been convicted. *Commonwealth v. Lyons,* 833 A.2d 245 (Pa. Super. 2003).

## Weight of the evidence

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, the reviewing court may only reverse the jury's verdict if it is so contrary to the evidence as to shock one's sense of justice. *Commonwealth v. Gooding,* 818 A.2d 546, 551 (Pa. Super. 2003), *appeal denied,* 575 Pa. 691, 835 A.2d 709 (2003).

Appellant argues that the Commonwealth's case was chiefly based on the victim's original written statement which was "falsely chaste" and omitted the occurrence of consensual sex prior to the non-consensual sex and that no eyewitness gave equivocally certain testimony that the victim was passed out or unconscious. See concise statement, ¶34. This claim ignores most of the evidence presented by the Commonwealth, including, but not limited to, eyewitnesses who observed the victim unconscious, the victim's statements to various persons after the event that she was unconscious, and unrefuted evidence that appellant destroyed a videotape of the event.

Determining the weight of the evidence is exclusively a duty for the jury, and it is in the province of the jury to determine the credibility of the witnesses and decide which evidence they believe. While appellant argues that the victim's original written statement was proven to be unequivocally false, a claim not at all supported by the record, this was a determination for the jury to make and, given the verdict, it is apparent that the jury disagreed with appellant. The verdict in this case in no way shocked one's sense of justice.

## Sufficiency of the evidence

Appellant next alleges that the evidence was insufficient to sustain the verdicts on the IDSI and rape charge. See concise statement, ¶35.

The standard of review for claims of sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Passmore,* 857 A.2d 697, 706 (Pa. Super. 2004). We rely on our recitation of facts (pp. 272-78) in concluding that overwhelming evidence was presented on both the rape and IDSI charges.

We note that the evidence to support the IDSI and rape claims was sufficient without *any* evidence of a date rape drug. Even if the victim had not been administered a date rape drug, there was still overwhelming evidence that she was unconscious when the assault took place and/or that appellant was aware that she did not know the assault was occurring (IDSI charge) and we rely on our recitation of the facts in support of this proposition. See *Commonwealth v. Erney,* 698 A.2d 56, 58-59 (Pa. Super. 1997) (evidence sufficient to support finding that intoxicated victim was "unconscious" within meaning of statute, even though victim had the ability to perceive some aspects of incident: victim was unaware of statements friend made to defendant during assault, and victim was unaware of duration of assault).

There was also ample evidence to prove that appellant had sex with the victim while she was unconscious (rape charge). This evidence included her statement to Officer Wojnar that when she woke up next to appellant

and asked what had happened and if they had had sex, appellant replied that they had, and her written statement, exhibit C-1, where the victim indicated that appellant said to her that he was the only one who had sex with her and it was after everybody left. (N.T. 10/24/03, p. 141; exhibit C-1.) Even the recanting victim indicated at trial that appellant came over to her house and apologized to her mom for not using a condom when he had sex with her. (N.T. 10/22/03, pp. 197-98.)

## VIII. *SVP Determination*

Appellant asserts numerous claims of error in our determination that he is a sexually violent predator. See concise statement, ¶¶93-133. Many of these claims are so vague and unspecific that it is difficult to ascertain what appellant is referring to. From what we can gather, appellant's main contention appears to be that there was insufficient evidence to classify him as an SVP. See concise statement, ¶¶101-102, 113.

A claim that the trial court relied upon insufficient evidence when designating a defendant an SVP pursuant to Megan's Law II, is reviewed under the following standard:

"A challenge to the sufficiency of the evidence is a question of law requiring a plenary scope of review. . . . The appropriate standard of review regarding the sufficiency of the evidence is 'whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offenses.' . . . [The] reviewing court 'may not weigh the evidence and substi-

tute their judgment for that of the fact-finder.' . . . Furthermore, a fact-finder is free to believe 'all, part or none' of the evidence presented. . . .

" 'At the hearing prior to sentencing, the court shall determine whether the Commonwealth has proved by clear and convincing evidence that the individual is a sexually violent predator.' . . . Accordingly, in reviewing the sufficiency of the evidence regarding the determination of SVP status, [the trial court will only be reversed] if the Commonwealth has not presented clear and convincing evidence sufficient to enable the trial court to determine that each element required by the statute has been satisfied . . . ." *Commonwealth v. Haughwout,* 837 A.2d 480, 484 (Pa. Super. 2003). (citations omitted)

Megan's Law II defines a sexually violent predator as:

"A person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality that makes the person likely to engage in predatory sexually violent offenses." 42 Pa.C.S. §9792.

Under this definition several factors must be established before a defendant can be classified as an SVP. First, the defendant must have been convicted of a crime set forth in section 9795.1(b)(2). Here, because appellant was convicted of several specific sexual assault offenses enumerated under this section, the first prong of the above definition is satisfied.

The second factor required to establish sexually violent predator status is the examination of the various as-

sessment factors set forth in section 9795.4—*Assessments*. This review should be undertaken in conjunction with the determination of whether a mental abnormality or personality disorder exists that makes the person likely to reoffend. 42 Pa.C.S. §9795.4(b). The salient inquiry mandated by the statute in determining SVP status is identification of the impetus behind the commission of the offense; that is, whether it proceeds from a mental defect/personality disorder or another motivating factor. The answer to that question determines, at least theoretically, the extent to which the offender is likely to reoffend, and section 9795.4 provides the criteria by which such likelihood may be gauged. *Commonwealth v. Bey,* 841 A.2d 562, 566 (Pa. Super. 2004).

In this case, we considered the exemplary credentials of SOAB member Dean Dickson and accepted his opinions that various factors warrant that appellant be classified as an SVP. (N.T. 4/6/04, p. 284.) Dickson explained that there are two risk factor categories which predispose an individual to the commission of criminal sexual acts. The first category includes psychopathy, antisocial personality disorder or an extensive criminal history. Dickson opined that appellant clearly meets two of the three criteria of this category, that is, antisocial personality disorder and extensive criminal history. (N.T. 4/6/04, p. 75.) Dickson also cited a second category of other risk factors that are indicative of a likelihood to reoffend, including deviant sexual arousal pattern, sexual offense history, or sex offense permissive cognitions. Dickson opined that sex offense permissive cognitions also applied to appellant because he had demonstrated a "pattern of thought" which caused him to violate an unconscious 17-year-old girl. (N.T. 4/6/04, p. 75.)

In addition to finding that appellant has a significant personality disorder, Dickson also examined the various assessment factors under section 9795.4 in determining that appellant meets the criteria for a sexually violent predator. (N.T. 4/6/04, p. 69.) The evidence produced at the SVP hearing was more than sufficient to establish that several of these assessment factors were met and proved by clear and convincing evidence that appellant should be classified as an SVP. These facts are detailed in pages 290-98 of this opinion, and we summarize the main assessment factors relied upon by Dickson.

### Facts of Current Offense—§9795.4(b)(1)

Dickson found that the nature of the sexual conduct, which again involved horrific acts against a young, unconscious victim, which were videotaped and later played for the amusement of others, evidenced appellant's extreme pattern of sex offensive permissive cognitions. Put more plainly, the nature of the sexual contact with the victim (assessment factor section 9795.4(b)(1)(iii)) reveals a pattern of thought wherein appellant believed that he had permission to insert a candle, vodka bottle, shot glass, and coat hanger into the victim's vagina and then have sexual intercourse with her while she was unconscious. (N.T. 4/6/04, p. 78.)

Dickson also found that such actions amounted to a display of unusual cruelty (assessment factor section 9795.4(b)(1)(vi)). While Dickson did not diagnose appellant as being a sexual sadist, he did find that there was an element of sadism in taking an unconscious woman and exposing her genitals for everyone to see while inserting objects into her vagina as a source of

amusement for everyone. The fact that appellant would prey on an unconscious 17-year-old in the way he did factored strongly into Dickson's opinion that appellant would reoffend, and we placed great weight on this assessment factor in finding appellant was an SVP. (N.T. 4/6/04, pp. 69-70, 75, 81.)

### Prior Offense History—§9795.4(b)(2)

Appellant's substantial criminal record dating back 10 years also weighed heavily in our determination that appellant should be classified an SVP (section 9795.4(b)(2)(i)).[24] Dickson stressed that accepted studies reflect that a risk factor for sexual reoffending is a nonsexual criminal history. (N.T. 4/6/04, p. 82.) Dickson also noted that appellant was on probation during the time of the assault and had also been on probation as a juvenile. Dickson opined that a substantial nonsexual criminal history is a risk factor for sexual reoffending. (N.T. 4/6/04, pp. 82-83.)

### Characteristics of Individual—§9795.4(b)(3)

Regarding appellant's age—(20 years) at the time he committed the instant offense, Dickson explained that

---

24. Appellant committed numerous crimes as a juvenile, including simple assault, disorderly conduct, burglary, criminal trespass, criminal conspiracy to commit burglary, theft by unlawful taking and receiving stolen property. As an adult, appellant was convicted of recklessly endangering another person, disorderly conduct and simple assault in December of 2002. In March 2003, appellant was convicted of possession of a controlled substance and possession of drug paraphernalia and in 2004, appellant was convicted of burglary and conspiracy. (N.T. 4/6/04, pp. 73-74; exhibit D-1.)

sex offenders under the age of 25 are at a high risk to reoffend compared to older offenders (section 9795.4 (b)(3)(i)). (N.T. 4/6/04, p. 83.)

Dickson also noted that appellant's continued contact with the criminal justice system, beginning at the age of 11, demonstrates a callous lack of propriety and concern for others, both of which are character traits indicating a likelihood to reoffend. (N.T. 4/6/04, p. 84.) Dickson further testified that appellant has boundary problems in terms of sexual issues, as well as very poor judgment overall based upon his criminal record and other factors. (N.T. 4/6/04, p. 86.)

As for the factor of whether appellant suffered from any mental illness, mental disability or mental abnormality (section 9795.4(b)(3)(iii)) as set forth above, Dickson found that appellant met the diagnostic criteria for antisocial personality disorder. Dickson elaborated that the essential features of antisocial personality disorder exhibited by appellant are a pervasive pattern of disregard for, and violation of, the rights of others occurring since at least age 15; the fact that he has repeatedly performed acts that are grounds for arrest; has demonstrated reckless disregard for others; has failed to sustain consistent work behavior; and has displayed conduct disorder prior to age 15, as evidenced by a criminal record that dates back to when appellant was 11 years old. (N.T. 4/6/04, pp. 71-72.) Certainly, placing a candle, light bulb and other objects into the vagina of an unconscious 17-year-old and then videotaping that event demonstrates, by any standard, a reckless disregard for others. We find that this evidence is more than sufficient to prove that appellant has antisocial personality disorder.

Factors Related to Risk of Reoffense—§9795.4(b)(4)

Finally, Dickson examined characteristics that are supported as criteria reasonably related to the risk of recidivism. Dickson noted that appellant's early onset of sexual offending is one of the top predictors of recidivism, according to a 1998 meta-analysis by Hanson and Bussiere.[25] (N.T. 4/6/04, pp. 86-87.) Appellant's antisocial personality disorder also highly correlates with the risk to reoffend, as well as his multiple prior criminal offenses. (N.T. 4/6/04, p. 87.) Appellant's previous incarcerations, employment instability, juvenile delinquency, and conviction for the current crime of rape and IDSI were also all significant factors Dickson considered that are consistent with recidivist sexual behavior. (N.T. 4/6/04, pp. 88-89.)

## Predatory Behavior

Appellant lists a host of allegations concerning the predatory aspect of the statute. See concise statement, ¶¶94, 105, 108, 112, 129. For instance, appellant claims that "the evidence was insufficient that the defendant was likely to engage in predatory sexually violent offenses." See concise statement, ¶101. The statute defines predatory behavior as acts directed at a stranger or at a person with whom a relationship has been established or promoted for the primary purpose of victimization. See 42 Pa.C.S. §9792.

---

25. Hanson and Bussiere conducted a meta-analysis that examines factors relating to sexual offender recidivism. See R. Karl Hanson and Monique T. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies,* Journal of Consulting and Clinical Psychology, vol. 66 no. 2 (1998).

Dickson opined that appellant's invitation to the victim to his house for a party, where she was provided with alcohol and drinks, which may have contained a date rape drug, reflected that appellant was attempting to establish a relationship for victimization.

Dickson explained: "he [appellant] brought the girl to a party where alcohol was being served. We have witnesses who state that she was given a drink that may have had a date rape drug in it. In her initial report to the Lower Southampton Police she said she was sleepy and passed out. Her body was used, her vagina, her genitals, her anus was used as a source of amusement for others at the party. Following those assaults she was then sexually assaulted by [appellant]. In that respect she came to the party, and whatever their prior relationship may have been, that relationship became sexualized and augmented for the amusement of others and then for his own sexual gratification."

We find that Dickson's opinion that appellant's acts were predatory is amply supported by the record. (N.T. 4/6/04, p. 96.)

Many of appellant's other claims regarding predatory behavior are repetitive. We found that appellant developed this relationship for predatory purposes and in ruling that the Commonwealth had proven, by clear and convincing evidence, that appellant should be classified as an SVP, we stated:

"Dickson considered the predatory behavior here, and I'm certainly not going to review that again. I'll spare everyone of that. But whether, as [defense counsel] argued, this relationship started out under the definition of predatory, as a relationship with legitimate means, clearly

that relationship and the purpose of that relationship changed dramatically once [the victim] was unconscious." (N.T. 4/6/04, p. 285.)

Regardless of how the relationship between appellant and the victim began (*i.e.,* they were friends/dating) the relationship was clearly one of victimization once appellant approached her with a shot glass, light bulb, candle and video camera as she lay unconscious on the futon. Whether through a date rape drug or her lack of awareness due to intoxication, the primary nature of their relationship was for victimization when appellant assaulted her at his party, in front of a room full of her peers, and subsequently replayed the incident on television.

Appellant also claims we erred as Dickson did not testify to any "predatory plan." See concise statement, ¶115. This contention is meritless, as there is no statutory requirement that an actual predatory plan is required.

Other General Claims of Error—SVP Hearing

Appellant also contends that we improperly discredited the entirety of appellant's expert, Dr. Voskanian. See concise statement, ¶93. It is well within the court's authority to make credibility determinations. Voskanian testified that appellant's insertion of the hanger into the victim's vagina to remove the shot glass was "considerate and demonstrated empathy." He also considered that inserting bottles, candles and shot glasses into an unconscious 17-year-old in full display of her friends while it is being videotaped was not cruel. (N.T. 4/6/04, pp. 264, 282-83.) Given these absurd and offensive statements, we were well within our discretion in disregarding Voskanian's opinion in its entirety.

Appellant also claims that 42 Pa.C.S. §9791 is unconstitutional under the United States Constitution and the recent United States Supreme Court case of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Concise statement, ¶96. *Blakely* is a federal sentencing guidelines case having no relation whatsoever to a constitutional challenge to Megan's Law. Our appellate courts have ruled that *Blakely* does not apply to Pennsylvania's sentencing guidelines. See *Commonwealth v. Bromley,* 862 A.2d 598 (Pa. Super. 2004). We are at a loss to understand how the *Blakely* case applies to a state Megan's Law issue. This is yet another example of the utterly frivolous nature of this appeal.

Appellant next raises issues regarding Dean Dickson's qualifications. See concise statement, ¶¶98, 103 and 109. "The qualification of a witness as an expert rests within the sound discretion of the trial court, and the court's determination in this regard will not be disturbed absent an abuse of discretion." *Commonwealth v. Malseed,* 847 A.2d 112, 114 (Pa. Super. 2004). We found Dickson's qualifications to be exemplary. The record fully bears this out. Appellant also raises a number of allegations concerning evidentiary rulings relating to Dickson. As these issues are just a continuation of meritless issues, we decline to address them.

Appellant next contends that Dickson's determination had no weight because he did not know that the victim had consensual sex with appellant in the office. See concise statement, ¶110. Appellant frequently alleges error regarding the pre-assault consensual sex that allegedly took place in the office. It is of no consequence that the victim may have had consensual sex with appellant in

the past. The jury found that the victim was unconscious and did not consent to objects being inserted into her vagina by appellant. No amount of previous consensual sex will change this fact.

Appellant also alleges we erred in finding that Dr. Voskanian agreed that appellant had an antisocial personality disorder with a sexually sadistic feature. See concise statement, ¶114. The Commonwealth extensively questioned Dr. Voskanian regarding the criteria for antisocial personality disorder as follows:

"*Prosecutor:* So you agree with Mr. Dickson that [appellant] is correctly diagnosed as having antisocial personality disorder?

"*Voskanian:* I do agree that [appellant] has antisocial behaviors consistent with antisocial personality. However, we need to take other things into consideration.

"*Prosecutor:* But you agree with that diagnosis, bottom line, correct?

"*Voskanian:* I agree with behaviors, that he does have antisocial behaviors, and diagnosis can be applied, yes."

As the record again directly refutes appellant's claim, this assertion is also frivolous.

Appellant next alleges that the trial court erred in ruling that the experts were not allowed to find, as a result of their investigation, that the futon incident was consensual. See concise statement, ¶122. Appellant's assertion takes our ruling out of context. While discussing the scope of cross-examination, the trial court stated that the issue of whether the incident was consensual or nonconsensual had been decided and proven beyond a reasonable doubt as evidenced by the jury's verdict. Therefore, we correctly stated that the issue of consent and whether the victim was unconscious were not to be re-

litigated during the Megan's Law hearing. (N.T. 4/6/04, pp. 99, 103.)

We find the remainder of appellant's allegations on Megan's Law to be meritless and unworthy of discussion.

## IX. *Sentencing Issues*

Appellant claims that further errors occurred during sentencing. Again, most of these claims are repetitive, meritless assertions without any explanation. See concise statement, ¶¶134-150.

Appellant was sentenced to a period of incarceration of nine to 18 years on the rape count, to run concurrently with a sentence of nine to 18 years for the IDSI charge. Appellant was also sentenced to six months to four years on the obscene and sexual materials charge to run consecutively to the IDSI and rape sentences. As set forth above, the sentencing range for both rape and IDSI was 54 months in the mitigated range, 66 to 84 months in the standard range, and 96 months in the aggravated range. The sentence for obscene and sexual materials was three months in the mitigated range, six to 16 months in the standard range, and 19 months for the aggravated range.

The minimum of our sentence for rape and IDSI, nine years (108 months) was 12 months above the aggravated sentencing range. (N.T. 4/6/04, p. 313.) Appellant argues that there was no basis for a sentence outside the guideline ranges and that the court failed to articulate sufficient reasons for such a sentence. See concise statement, ¶134.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Hess,* 745 A.2d 29, 31 (Pa. Super.

2000). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill will." *Commonwealth v. Burkholder,* 719 A.2d 346, 350 (Pa. Super. 1998).

Furthermore, in exercising its discretion, the sentencing court may deviate from the guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offenses as it relates to the impact on the life of the victim and the community, so long as he also states of record "the factual basis and specific reasons which compelled him to deviate from the guideline range." *Commonwealth v. Cunningham,* 805 A.2d 566, 575 (Pa. Super. 2002), citing *Commonwealth v. Burkholder,* 719 A.2d 346, 350 (Pa. Super. 1998). "The sentencing guidelines are merely advisory, and the sentencing court may sentence a defendant outside of the guidelines so long as it places its reasons for the deviation on the record." *Cunningham,* 805 A.2d at 575.

Here, we fully explained our reasons for sentencing outside of the guidelines:

"I've considered the pre-sentence investigation report, as I am required to do, and I've read that carefully. In fashioning my sentence, I am taking into account the protection of the public, the gravity of this offense, the rehabilitative needs of the defendant, who I know is very young, 21 years old, and who I thought up until the point of my question had finally gotten it, but I'm not so sure

about that based on the response I received, which I find showed a lack of contrition.[26] . . .

"It seems to me that there were clear inferences and significant circumstantial evidence which established that the defendant or someone in concert with the defendant drugged [the victim], and that this act was premeditated, calculating, callous, and done to take advantage of a 17-year-old girl.

"I will also take into account . . . that [appellant] obstructed justice after this crime was committed. That is absolutely clear. There was a videotape of this crime taken, and that was destroyed at his behest. And he specifically told witnesses to lie. . . .

"I take into account the effect on [the victim], the humiliation, embarrassment, shame that she is suffering. And it is clear to me, although as I said, I'm not a psychiatrist, that the trauma visited on this 18-year-old is profound and overwhelming, and her pain to me is palpable.

"Certainly I take into account the facts of this crime, the fact that [appellant] treated a 17-year-old girl like a sideshow in my view for his amusement and the amusement of his friends, ignoring the fact that she is, at the end of the day, a human being. I think [Dean Dickson] got it right when he said it appeared to him to be that [appellant] was enjoying someone suffering while this crime took place.

---

26. Prior to imposing sentence, we asked appellant whether the victim was unconscious or passed out. Appellant replied that the victim was not unconscious and she was willing at the time. Appellant went on to say that at the beginning he blamed her for it and "how much trouble she got me into," but now has fully forgiven her. (N.T. 4/6/04, p. 312.)

"And most of all I take into account that [appellant] in my view took from [the victim], he stole from [the victim] something of incalculable value; that is, he stole her dignity. And this more than anything else in my view makes this crime particularly heinous." (N.T. 4/6/04, pp. 315-18.)

The above explanation, and reasons for imposing the sentence we did, fully comply with all sentencing requirements.

## CONCLUSION

For the reasons stated above, appellant's judgment of sentence should be affirmed.